ENDRESS, Appellant, vs. SHOVE and wife, imp., Respondents.

*March 23 — April 9, 1901.*

*Appeal: Findings: Questions reviewed: Evidence.*

1. The rule that a finding of facts by a trial court will not be disturbed on appeal unless it is contrary to the clear preponderance of the evidence is unbending, even though the trial judge, in rendering his opinion, stated that his impressions on the trial were different, and that he changed his mind upon taking time to study the case.
2. There is a wide range between mere preponderance of evidence and that preponderance of evidence necessary to overcome the decision of a trial judge on controverted questions of fact; and where the evidence on a certain issue is extensive and conflicting and the appellate court cannot say that the preponderance of the evidence against the finding is so great that it could not be easily overcome by the appearance of the witnesses and other aids of the trial court not available on appeal, the finding will be sustained.

APPEAL from a judgment of the circuit court for Door county: S. D. HASTINGS, JR., Circuit Judge. *Affirmed.*

Action under sec. 3347, Stats. 1898, to realize on a pledge of two life insurance policies on the life of defendant *Theodore C. Shove,* which were assigned to plaintiff in 1886 as

collateral security for *Mr. Shove's* note of $2,000. His wife and the insurance companies were joined with him as defendants. He answered separately, alleging as a defense and also as a counterclaim the following: From June 1, 1884, down to and inclusive of April 12, 1892, said defendant and plaintiff's son, Adolph J. Endress, were associates in banking business. At the last date mentioned, and for some time theretofore, the enterprise was in a corporation known as the T. C. Shove Banking Company. During the time of such association Adolph J. Endress was general agent for plaintiff in all of his business affairs. They daily consulted together in regard to such business. On the date last named the banking corporation, by reason of its insolvency, made an assignment for the benefit of creditors, in consequence of which defendant lost all his property. On the day of the assignment it was agreed between plaintiff, acting by his son Adolph, and said defendant, that the latter should give to the former a note for $4,000 secured by a real-estate mortgage, in payment of the $2,000 note mentioned in the complaint and to secure a new loan of $2,000, the old note and the collateral to be delivered to defendant upon the execution and delivery of the new note and security, so that the collateral could be assigned to *Mrs. Shove.* Such agreement was fully carried out by *Mr. Shove, Mrs. Shove* joining in the mortgage on the real estate. The note and mortgage were delivered to Adolph J. Endress. He delivered the same to plaintiff, but the latter refused to comply with his part of the agreement. He has kept both the new note and security and the old note and security, and is endeavoring to enforce payment of such old note by realizing on the collateral in this case. Appropriate relief was prayed for.

Plaintiff put the allegations of the counterclaim in issue. On the trial the evidence showed the following: Plaintiff at the time of the transaction in controversy was about

seventy and *Mr. Shove* about fifty-six years of age. *Mr. Shove* had been engaged in the banking business for upwards of thirty years. In 1884 he associated with him Adolph J. Endress, who had theretofore for some time been in his employ. At the time the business association commenced young Endress was about twenty-one years of age. Plaintiff furnished capital for his son to the amount of about $10,000, taking the son's note therefor, guaranteed by *Mr. Shove*. In July after the partnership was formed the business of the bank was put into a corporation under the name of the T. C. Shove Banking Company, $10,000 of the capital stock being issued to young Endress as his portion thereof. June 9, 1886, *Mr. Shove* borrowed $2,000 of plaintiff, giving therefor his promissory note secured by an assignment of the policies in suit. June 1, 1888, the note was renewed. The new note and the policies are those mentioned in the complaint. The bank made an assignment for the benefit of creditors in 1892, at which time a note of $4,000, secured by a mortgage on the bank building belonging to *Mr. Shove*, was agreed to be given to plaintiff, the business in his behalf being done by his son. The agreement was consummated April 14, 1892. In the meantime the real estate was attached in a suit commenced by one Hubbard against *Mr. Shove* to recover several thousand dollars, the claim being so large as to render the mortgage security of uncertain value. When the agreement was made *Mr. Shove* was in a very anxious state of mind as to the future of himself and family. It was to him a day of great excitement because of the impending assignment of the bank and the probable effect thereof upon his affairs. On the day the agreement was made, either by the suggestion of *Mr. Shove* or the voluntary act of Adolph J. Endress, $2,000 in currency and $1,155 in value of government bonds, part of the assets of the bank, were taken therefrom and delivered to *Mr. Shove* at the lawyer's office where the assignment papers were in

process of preparation. When the note and mortgage were delivered to Adolph, *Mr. Shove* was sick in bed. The assets of the bank, taken as aforesaid, were subsequently returned. The testimony as to the taking thereof is conflicting. *Mr. Shove* laid the blame to young Endress, claiming that he, *Shove,* was so angry with the young man for perpetrating the act that he threatened to have him arrested and that it it caused strained relations between them. Mr. Endress claimed that he took the money and bonds from the bank against his own judgment, by the express direction of *Mr. Shove.* The evidence is undisputed that the property taken was delivered to *Mr. Shove,* was in his possession when or about the time the alleged agreement was made, and that on the evening of the day of the taking *Mr. Shove* divided the subject thereof, giving part to young Endress and keeping the balance, and that three or four days elapsed before the property was delivered to the assignee of the bank.

*Mr. Shove's* version of the agreement as to the note and mortgage for $4,000 was substantially according to the allegations of his answer. He was corroborated in that by *Mrs. Shove.* She said that Mr. Endress and her husband came to her to obtain her signature to the mortgage, and that the agreement in regard to the matter was then stated, and she was promised that if she would sign the mortgage the insurance policies would be delivered so they could be assigned to her in accordance with a previous assignment thereof. In explanation of the testimony as to a previous assignment, an instrument was introduced in evidence showing that such policies and several others were assigned to *Mrs. Shove* in 1891, and that young Endress was a subscribing witness. He testified that he had no recollection of any such paper, yet the evidence tended to show that he not only witnessed but had personal charge of it and sealed it up in the condition in which it was found in the bank.

Mr. Endress's version of the agreement as to the mortgage

was that *Mr. Shove* proposed to him that he should pay his father all he could of the $10,000 note and that *Mr. Shove* should secure the balance; that it was considered that such balance would be about $4,000 and that the note and mortgage were delivered accordingly; that the giving thereof was the voluntary act of *Mr. Shove;* that he suggested it during the time of great excitement aforesaid; that it was made up that he, Endress, should pay his father some $6,000 upon the guaranteed note and that *Mr. Shove* should secure the balance of the principal; that upon such understanding being arrived at, *Mr. Shove* attended personally to having the mortgage drawn, and that the witness, pursuant to the understanding, turned over to his father, as payment upon the $10,000 note, all the property he possessed, amounting to about $6,000.

The following facts in evidence are referred to as corroborative of *Mr. Shove's* version of the agreement as to the giving of the note and mortgage: $2,000 was indorsed on the $4,000 note a short time after its delivery without any actual payment being made. A short time after such delivery the policies were demanded on behalf of *Mr. Shove,* at which time plaintiff did not refuse to comply therewith but said he would do so when his son arrived, who was then absent. The $10,000 guaranteed note was not taken up or canceled at the time the $4,000 note was delivered, nor thereafter. The insurance policies, if handled adversely to *Mr. Shove,* were of little value as security for the $2,000 note. When the verbal contract to give the mortgage was made, the real estate to be mortgaged was good security for $4,000. On the other hand the evidence showed or tended to show that after the demand for the policies was made, nothing more was said about them till the commencement of this action. They, together with the $2,000 note, were allowed to remain in plaintiff's possession without objection. In 1892 *Mr. Shove* claimed that the note and mortgage were

given on account of the guaranty of the $10,000 note, and made no claim to the contrary till the commencement of this action. *Mrs. Shove* claimed in 1892 that she had no knowledge of the purpose of the note and mortgage when they were given. The indorsement of $2,000 was made after it was known that the value of the real estate was largely covered by the Hubbard attachment. Plaintiff's son knew that fact when he accepted the mortgage, but was informed by *Mr. Shove* that the attachment would not hold. Adolph turned over to his father on April 12, 1892, all property possessed by him, reducing the amount due upon the note to about $4,000. The indorsement of the $2,000 was explained by *Mr. Shove* as having been made because respondent refused to carry out the agreement to loan him that sum. He explained the purpose he had in view in obtaining the loan by saying that the circumstances in which he was situated suggested that it was a prudent thing to do to make some provision for the future needs of his family. The indorsement was explained by appellant as having been made at the request of *Mr. Shove* to leave him a sufficient interest in the mortgaged property to secure a creditor by the name of Rahr, who was not called to testify upon the trial. Appellant said he looked over the property turned out by his son and concluded that he could make $2,000 out of six lots in Rhinelander, taken for $1,500, and in that view he consented to *Mr. Shove's* request to indorse the $2,000 upon the note so he could secure Mr. Rahr. The lots were purchased by young Endress, shortly before they were turned out to appellant, for $1,300. The evidence was to the effect that if the note and mortgage were given for the purpose testified to by appellant, or that testified to by respondent, no effort was made to deal with exactness as regards the amount due upon the outstanding notes.

The trial court found the facts substantially as alleged in *Mr. Shove's* counterclaim, and rendered judgment accordingly.

Endress vs. Shove and wife.

For the appellant there was a brief by *Nash & Nash*, and oral argument by *L. J. Nash*.

For the respondents the cause was submitted on the brief of *Greene, Fairchild, North & Parker*.

MARSHALL, J. The sole question raised on this appeal is, Are the findings of fact contrary to the clear preponderance of the evidence? Generally, in determining such a question, the circumstance that a trial judge has the benefit of the personal appearance of witnesses while giving their testimony, in determining the weight that should be given thereto, is regarded as an important factor. That is largely the reason why a reversal of his conclusion on a question of fact is not deemed proper merely because the evidence preserved in the record seems to preponderate that way. Such preponderance is not effective to call for such a result unless it is sufficiently manifest and convincing to overcome any probable effect, upon the judicial mind, of the appearance of the witnesses or other aids, which only the trial court can have, in discovering the truth. It is said that we should not adhere to that rule in the instance under consideration, because the learned circuit judge, in rendering his opinion, stated that his impressions on the trial were in favor of plaintiff, and that he changed his mind upon taking time to study the case. We are unable to say from that, that the personal appearance and conduct of the witnesses were not factors in reaching the final conclusion. It is more reasonable to say that the study which the trial judge gave the case enabled him to more accurately weigh what the witnesses said in the light of all the circumstances developed on the trial and the personal appearance of the witnesses, than he did as the trial progressed. So the findings of fact before us must be tested by the usual rule governing cases tried by the court. It is not improbable that the system requiring that fails to reach a just result in some cases. No

system of jurisprudence ever devised by human agency has, nor would any that could be so devised, come up to the standard of absolute perfection. All that can be done is to administer justice along the lines which experience teaches are most likely to give a full measure of justice to the litigants. Having done that, the result must stand as the infallible truth, for there is no tribunal that can legally question it. The rule to which we have referred, governing this case, is unbending. It admits of no exception where right rules of law are applied to the evidence, and no complaint of that character is made here.

The evidence in the record has been carefully examined and weighed, giving due significance, it is believed, to each and every circumstance established thereby. If the story told by appellant's son is correct, great injustice has been done to him. If the story told by respondent *Theodore C. Shove*, which the court believed in the main, is true, the judgment is right. There are circumstances that strongly corroborate the testimony of young Endress, and circumstances that strongly discredit it. The same is true as to the testimony of *Mr. Shove*. The corroborating and discrediting circumstances as to the testimony of each are numerous. The weight of one, as to pointing to where the truth lies, cannot be determined without balancing it with others, and then the preponderating weight is not so significant but that it might be overcome readily by the aids which the trial court had, that have not and cannot come to this court. That states the condition of mind in which we are left as a result of an industrious study of the evidence. It does not permit a disturbance of the judgment appealed from. It is useless to discuss the evidence in detail. It must be well understood by the profession that although in theory there is a new trial here on questions of fact, where the trial below was by the court and a bill of exceptions containing the evidence is preserved to support

exceptions to the findings, the principle has become so firmly established, that such findings must be regarded as verities in the case unless overcome by a clear preponderance of the evidence, that such trial is in fact far different from an original trial. The presumptions indulged in, in favor of such findings, are not easily overcome, so it may happen — we venture to say it does happen in some cases — that a judgment of affirmance is rendered where a reversal would occur if such presumptions were left entirely out of consideration. That cannot be helped. The judicial policy of the court and its interpretation of the statute governing the subject are firmly intrenched in our system. They cannot be varied in this case even if we were to say that the evidence in the record, looking at that alone, impresses us contrary to the conclusions reached by the trial court. There would still be left that insurmountable difficulty to a reversal,— absence of such clear preponderance of evidence against the findings as to convince us to a reasonable certainty that the trial judge decided wrong. It must not be lost sight of in this class of cases that there is a wide range between mere preponderance of evidence and that preponderance necessary to overcome the decision of a trial judge on controverted questions of fact. We cannot find that clear preponderence of evidence in this case.

*By the Court.*— The judgment appealed from is affirmed.