JOHNSON et al, Appellants, v. SHAVER, et al, Respondents.

(172 N. W. 676).

(File No. 4427.    Opinion filed May 13, 1919.    Rehearing denied June 3, 1919.)

1. **Wills—Right of Property Disposal at Will, Limitations.**

Every person competent to contract has statutory right to dispose of property by will, subject only to limitations of sound public policy; in exercise of which right he may obey dictates of his own will and feelings, whether they are or not such as others would commend or condemn.

2. **Same—Unjust, Unnatural Bequests, Devises, as Related to Mental Capacity, Undue Influence.**

But while such is the unquestioned rule of law, and while seemingly unjust and unnatural bequests or devises are not alone sufficient evidence of mental incapacity or undue influence, they are circumstances entitled to consideration and weight on both issues, and may be sufficient to impose on proponent the necessity of giving some reasonable explanation of the will's unnatural character, or of showing its character is not the offspring of mental defect, obliquity or perversion.

3. **Same—Will Producing Unnatural, Unjust, Results, Judiciary Scrutiny Re—Proof Necessary to Support—Mistake, Fraud, Undue Influence, Re.**

Although testator has abstract right of disposing of his estate by will as he may desire, yet a will producing unnatural and unjust results demands close judicial scrutiny; and in order to sustain such will, there should be at least fair proof that testator was of sufficient capacity to comprehend its import, and the trier of the case should believe that neither essential mistake on his part nor the fraud nor undue influence of others produced such disposition.

4. **Wills—Proof, Burden Of—Statute**

The burden, under Rev. Civ. Code 1903, Sec. 998, Rev. Code 1919, Sec. 604, relating to competency of persons to make wills; Prob. Code 1903, Sec. 44, Rev. Code 1919, Sec. 3211,

concerning required proof of probate of will; and Prob. Code 1903, Sec. 50, Rev. Code 1919, Sec. 3229, concerning judicial certification of proof of will—is upon proponent of a will to establish testamentary capacity of testator; and such is the general rule regardless of statutes.

5. **Wills—Testator, Mental Soundness Of—Duress, Etc.—Rule—Statute, Will, When Rejected.**

Under Rev. Prob. Code 1903, Sec. 50, Rev. Code 1919, Sec. 3229, providing that if court be satisfied upon proof that will was duly executed, and that testator was of sound and disposing mind, and not acting under duress, menace, fraud or undue influence, certificate of proof shall be made, etc., the law requires that no will be admitted to probate except that of a testator of sound mind, and unless court is fully satisfied on this point, the instrument should be rejected.

6. **Wills—Incompetency From Mental Incapacity, Whether Undue Influence Applicable.**

Where there is mental incapacity rendering one incompetent to make a will, there can be no undue influence, in a legal sense, since such influence presupposes a will which, without such influence, would have been valid; and one mentally incompetent to do an act cannot, as to such act, be subject to coercion.

7. **Wills—Invalidity, Whether From Mental Incapacity, Or Undue Influence—Physical, Mental, Weakness, Whether Material—Influence, Amount Necessary.**

But it is often a close question, whether invalidity of a will flows from mental incapacity, or undue influence; and while mere physical weakness is not necessarily evidence of undue influence, evidence of physical and mental weakness is always material upon question of undue influence; and the amount of influence necessary to affect testator varies according to strength of his mind.

8. **Wills — Undue Influence, Burden of Proof, Preponderance — Burden Re Unnatural Will.**

The burden is upon contestant to establish undue influence; a preponderance of evidence being sufficient to maintain such burden. And where will contains unjust or unnatural provisions, the onus is upon proponent to prove a reasonable explanation of the will's unnatural character; necessitating fair proof that testator had mental capacity to comprehend its import; and court must, from the evidence, believe that undue influence did not produce the unjust or unnatural disposition.

9. **Wills—Undue Influence, Inferential Proof—Relations, Etc., of Parties, Consideration of, As Guides.**

Undue influence is not usually exerted in the open, and it is usually solely through inferences drawn from surrounding facts

and circumstances that a court concludes a will is the product of undue influence. The relations of the parties, conditions surrounding them, the attitude they occupy toward each other, the influences controlling their actions, the habits and inclinations of testator, the purposes and wishes expressed when leading verity to a statement, all furnish guides for the court.

10. **Same—Keeping Will a Secret, Effect, Re Undue Influence.**

The keeping of the existence of a will secret from those having equal right to know of its existence, is a badge of undue influence. ·

11. **Wills—Previous Declaration of Testator Inconsistent With Will, Competency, Relevancy, Of—Competency Re Capacity.**

The declaration of testator made previous to execution of will, and indicating a purpose inconsistent with its provisions, is competent and relevant, in connection with other evidence, as tending to show susceptibility to undue influence; and also on' question of testamentary capacity.

12. **Wills—Mental Delusions, Evidence of, When Competent Re Testamentary Capacity.**

While mental delusions disconnected with, or having no effect upon testamentary act, are insufficient to invalidate a will, yet evidence of such delusions ·is competent upon question of general testamentary capacity.

13. **Appeals—Error—Reversed on Facts, Rule Re Preponderance of Evidence—"Clear" Preponderance, Construed—Discovery of Truth, Trial Court's Advantage.**

Appellate courts should hesitate to reverse decisions of trial courts upon questions of fact, and will do so only when finding same clearly contrary to clear preponderance of evidence; and that there be a clear preponderance, requires it to be so apparent as to manifestly outweigh any probable legitimate influences upon trial court of those advantages for discovering truth which reviewing tribunal cannot have.

14. **Appeals—Error—Reversing on Evidence—Clear Preponderance, Non-applicable to Error in Law Below.**

The rule, requiring clear preponderance of evidence to sustain reversal, does not apply to case of trial court in applying wrong rules ·of law to evidence.

15. **Evidence—Proof of Will—Attorney Drafting Will, Testimony of Re Reasonableness of Testamentary Provisions, Over Objection of Privilege, Competency, Ground Of—Attorney's Representative Capacity, Presumption Re.**

In proving a will, the testimony of an attorney who drafted the will is competent on question. of reasonableness of testamentary disposition,. as against the objection that the communication between him and testator was priviledged; its competency resting solely on ground that an attorney drafting a will

is presumed to impartially represent the estate and to be without bias.

**16. Evidence—Same—Attorney Drafting Will, Testimony of Re Testamentary Capacity, Presumption Re.**

Said presumption may not be justified in relation to issue as to testamentary capacity, as an attorney would naturally hesitate to admit he had drawn a will for one he considered to be without testamentary capacity. So held, where the attorney so testifying did not remain neutral, but appeared in court as one of the attorneys for proponents of the will.

**17. Attorneys—Attorney Drafting Will, and Testifying Re Testator's Capacity and Reasonableness of Will—Appearance on Proof of Will, Action Condemned Under Bar Canon of Ethics —Attorney's Credibility.**

Such attorney, bound to know that he would be called as witness to testify to matters going to merit of at least one issue raised by contestants of a will, should, in conformity with 19th Canon of Ethics adopted by our State Bar Association and the American Bar Association, have refused to act as attorney for proponent; and his evidence is not entitled to that credence it would have had if he had preserved that neutrality between the parties that a high sense of professional propriety would have demanded.

**18. Evidence—Will, Proof Of—Testimony of Disinherited Daughter Re Trouble With Testator, Competency.**

A daughter of decedent, who was bequeathed under his will only a merely nominal sum of money, may testify she never had any trouble with her father, as against objection that it related to transactions between said daughter and testator.

**19. Evidence—Will, Proof Of—Perjured Testimony of Beneficiary, Effect—Falsus In Uno, Rule Applied.**

The fact that witnesses in support of a will, and who testified as proponents thereof, and who were substantially sole beneficiaries thereunder, committed willful perjury in their testimony, destroyed the provative force of their other testimony.

**20. Will—Husband's Will, Unreasonableness Of—Previous Property Division With Divorced Wife, as Explanatory of Will, Effect— Evidence Considered**

Where proponents' theory is that testator disposed of his property as he did, under a will attacked as unreasonable wherein it clearly discriminated between two daughters as against two others who were substantially under the mother's care and custody after the parents' divorce, there having been a division of the husband's property with his wife when they were divorced—because he had so previously divided his property, because he did not feel kindly toward the daughters in

the mother's custody, and because he had lived with the daughter who was the largest beneficiary under the will; there being no evidence that one of the daughters receiving the much larger devise ever showed any greater interest in her father's welfare than either of those bequeathed but $5 each, the overwhelming evidence showing that testator's favorite daughter was one receiving a nominal bequest, and there being no evidence that testator believed or had reason to believe that his former wife or either of the daughters receiving the nominal bequests had any property; the daughter devised the largest proportion least needing financial assistance; testator having remarked to one witness that he was going to remember that one of the daughters receiving the largest devise because she had been good to him, etc, and that the other two children (i. e. those receiving the nominal bequests) would be taken care of by their mother, held, that such theory of disposition of his property because he had previously so divided with his wife is unsupported by the evidence.

21. **Wills—Testator, Competency—Physical, Mental, Weakness, Bright's Disease, Unexplained, Unnatural Provisions of Will, Delusions, Hallucinations, Whether Caused By—Evidences Re Competency Summarized.**

Where testator and his wife separated and several years thereafter were divorced, the four daughters at that time ranging in age from 11 to 17 years, the 3 youngest remaining with their mother, the oldest and a boy (the latter having afterward died) being away at school; there being no evidence but that the best relations existed at all times between the children and their parents, or that the former took sides as between the parents, the father having some years later and for some years lived alternatively with the son and with the daughter J. until she married; that he had an especially tender feeling toward the youngest daughter, M, and there being no just or natural reason why, in disposing of his property, testator should prefer the daughter T. (who was bequeathed $4000) over either the daughters E. and M. (who were bequeathed but $5. each;) that J. used her influence upon testator in favor of T; that testator for some months prior to his death and on the date of making his will resided with J. (who was bequeathed and devised by far the larger portion of his estate;) that the mother, a school teacher, made her home during her vacations with her daughter E, that J. owned 160 acres of land and, with her husband, their home, and had one child, that T. was unmarried, and without property, that E. was married, had two children, lived with her husband in a substantial home, that M. was unmarried, and without property; that testator for years had been seriously addicted to the use

of intoxicants and for several years prior to his death was afflicted with Bright's disease, to the last stages of which he was approaching shortly before he made his will, that his mentality some two days after will was made was dull from uremic poison, that he could not concentrate his mind, and was not in full possession of his ordinary intellect, one attending physician and specialist on Bright's disease having testified that testator was at time of making his will in a semi-comatic condition, the last stages of said disease, that in such condition delusions and hallucinations might be apparent; and pronounced him of unsound mind; proponents testifying that such unsoundness had extended back at least a month and was of continuous nature, that within a day or two of said date testator was much worse and was afflicted with a sort of coma; the undisputed evidence of disinterested parties showing that testator had delusions and hallucinations; another physician in continuous care of decedent for nearly a fortnight before he died testifying to testator's delusions at times during said period, that he was stupified during much of said time; another physician who never saw decedent and called by proponents testifying that, where there is much uremie it affects the sufferer's mind, and that delusions might result from such poisoning; two subscribing witnesses testifying to testator's soundness of mind; one close friend testifying that about the time of the making of the will there had been a great change in his condition and that his memory was gone; another witness testifying that he had delusions and that he considered him unsound, other disinterested witnesses testifying that he was incoherent, his mind wandered, "that he was absolutely off;" other witnesses testifying, some that he was sound, others that he was of unsound mind, contestants testifying that their father had delusions, and to other facts evidencing mental and physical weaknesses, proponents testifying to the contrary; the attorney who drew the will testifying to a conversation with testator before the will was drawn; that he related family history explanatory of his reasons for disposing of his property as he did; the several physicians testifying in the light of the attorney's testimony, hypothetically stated (assumed to be true) that he was possessed of sufficient mentality to understand his property, his relatives, etc.; the overwhelming testimony regardless of hypothetical questions, showing his mental incompetency; that testator was naturally obstinate and not easily influenced, while yet the almost undisputed evidence was that after he came to live with J. some weeks before his death, he was easily influenced; that several years before he died he told an old friend he did not want to make a will, that the laws of the state were better than a will, and that he had "no difference between these four

girls;" that shortly before executing the will he told another witness he intended to give his property to all of his girls; that a day or two before the attorney was instructed as to the will he said he was going to give his property "to Jean's child;" that some two months prior thereto he told another witness he was going to will it to "Jean, Theodora, and the child;" it being undisputed that Jean was influential in getting testator to give T. the $4000, opposed notifying contestants of the serious illness of their father, that as soon as the will was executed she went to get the papers belonging to him, and requested E. not to speak to her father of property matters; the clear preponderance of evidence—being that of contestants and two disinterested witnesses as against testimony of T—that when the will was offered for probate T. denounced it as being crooked, and laid the unjust and unnatural provisions thereof to Jean's influence; there being evidence that some settlement was made by J. and T.—the latter not having contested the will; therefore, held, that while there might not be in the record sufficient evidence from which to conclude that the will was the result of undue influence, provided such record showed testator to have been well and mentally normal at time he executed the will—yet, in view of his enfeebled physical and mental condition and the unjust and unnatural provisions of the will, which proponents have failed to reasonably explain, the clear preponderance of evidence establishes that testator, if not absolutely mentally incompetent to make a will, was so controlled in his acts in its making by undue influence of his daughter Jean, that the same was not his free act.

McCoy, J., and Smith, P. J., dissenting.

Appeal from Circuit Court, Tripp County.    Hon. WILLIAM WILLIAMSON, Judge.

In the matter of the estate of James Golder, deceased. The county court by order admitted will to probate, upon appeal from which order by contestants the circuit court affirmed the order. After reversal by the Supreme Court upon appeal from said order, (37 S. D. 397, 158 N. W. 734), the circuit court made findings that decedent was at time he executed the will, of sound and disposing mind and not acting under undue influence; from the judgment entered upon such findings, and admitting the will to probate, and from an order denying a new trial, Ellen Johnson and Margaret Golder, contestants, appeal.    Reversed.

*Dolezal & Johnson, Frank C. O'Halloren,* and *E. O. Patterson,* for Appellants.

*French, Orvis & French,* and *Doherty & Talbott,* for Respondent.

(1) To point one of the opinion, Appellants cited:

Revised Codes 1903, page 735, § 998; Revised Codes 1903, page 1016, § 44; In re Layman's Will, (Minn.) 42 N. W. 286; In Re Noyes, 105 Pac. 1013.

(8) To point eight, Appellants cited:

Walls v. Walls, 99 S. W. (Ky.) 969.

(9) To point nine, Appellants cited:

Cole v. Getzinger, (Wis.) 71 N. W. 75; Gross v. Courtley, (Ky.), 170 S. W. 600.

(15) To point fifteen, Appellants cited:

Sec. 538, Code Civ. Proc.

Respondents cited:

In re Semper's Estate, 85 N. W. 217 (Minn.).

WHITING, J.   One James Golder died in this state on August 23, 1914, leaving property and a will purporting to dispose thereof.  He was 59 years old at the time of his death, and he left surviving him four children: Jean Shaver, aged 25 years; Ellen Johnson, aged 23 years; Theodora Golder, aged 21 years; and Marguerite Golder, aged 19 years.  By the terms of said will Ellen and Marguerite received $5 each, Theodora $4,000 and Jean the residue of all property, real and personal which probably amounted in value to some $20,000.  Jean was appointed executrix.  When Jean proposed this will for probate, Ellen and Marguerite contested same, alleging testamentary incapacity and undue influence. The county court admitted the will to probate.  Upon appeal and trial de novo, the circuit court admitted such will to probate. Upon appeal to this court we reversed the circuit court on questions of practice.  In re Golder's Estate, 37 S. D. 397, 158 N. W. 734.  Upon second trial in circuit court such court made findings that said James Golder was, at the time of the execution of such will, of sound and disposing mind, and not acting under undue influence.

From the judgment entered upon such findings and from an order denying a new trial, this appeal was taken.  The sole question for our consideration is whether or not the trial court erred in the above findings.

There are certain propositions that are so well established as to need no citation of supporting authorities; others that have been settled in this jurisdiction by the decisions of this court; and others concerning which the courts are in dispute, but which we deem supported both by reason and the so-called "weight of authority."

[1-3] Every person competent to contract has a right, given by statute, to dispose of property by will subject only to such limitations as a sound public policy may dictate. In the exercise of such right he may obey the dictates of his own will and feelings whether they are such as others would commend or condemn. But while the foregoing is the unquestioned rule of law, and while seemingly unjust and unnatural bequests or devises are not alone sufficient evidence of mental incapacity or undue influence, they are circumstances entitled to consideration and weight on both issues, and they may be sufficient to impose on the proponent "the necessity of giving some reasonable explanation of the unnatural character of the will, or, at least, of showing that its character is not the offspring of mental defect, obliquity or perversion." Redfield on the Law of Wills, 515; Walls v. Walls (Ky.) 99 S. W. 969; Gay v. Gillilan, 92 Mo. 251, 5 S. W. 7, 1 Am. St. Rep. 712. "Although the testator has the abstract right of disposing of his estate by will as he may desire, yet a will which produces unnatural and unjust results demands close judicial scrutiny." Alexander on Wills, 884. And "in order to sustain any unjust, unnatural, or absurd will * * * fair proof at least should be afforded that the testator was of sufficient capacity * * * to comprehend its import; and, furthermore, the trier of the case should believe that neither essential mistake on his part nor the fraud nor undue influence of others about him produced so unhappy a disposition." Schouler on Wills, etc., § 77.

[4, 5] The burden, under our statute, is upon the proponent of a will to establish the testamentary capacity of the testator. Section 998, Rev. Civ. Code, section 604, Rev. Code 1919; section 44, Rev. Prob. Code, section 3211, Rev. Code 1919; section 50, Rev. Prob. Code, section 3229, Rev. Code 1919. It was so held under similar statutes in Layman's Will, 42 N. W. 287, and in Seebrock v. Fedawa, 30 Neb. 424, 46 N. W. 650. This is the gen-

38—Vol. 41, S. D.

erally recognized rule regardless of statutes. Alexander on Wills, 541, 547; Schouler on Wills, § 225. In the light of section 50, Rev. Prob. Code, supra, which provides:

"If the court be satisfied upon the proof taken that the will was duly executed, and that the testator was, at the time of the execution thereof, of sound and disposing mind, and not acting under duress, menace, fraud or undue influence, a certificate of the proof and the facts so found, signed by the judge and attested by the seal of the court, must be attached to the will"

—the following from Alexander on Wills, 543, is especially pertinent:

"The law requires that no will be admitted to probate except that of a testator of sound mind; and, unless the court is fully satisfied on this point, the instrument should be rejected."

[6, 7] Where there is mental incapacity rendering one incompetent to make a will, there cannot be undue influence in a legal sense, as the existence of undue influence presupposes a will which, without such influence, would have been valid. Gwin v. Gwin, 5 Idaho, 271, 48 Pac. 295; Alexander on Wills, 880. One who is mentally incompetent to do a certain act cannot, as to such act, be the subject of coercion. But it is often a close question whether the invalidity of a particular will should be placed upon mental incapacity or upon undue influence. Certain it is that while mere physical weakness is not necessarily evidence of undue influence (Hackett v. Hackett, 33 S. D. 208, 145 N. W. 437), evidence of physical and mental weakness is always material upon the question of undue influence (Ekern v. Erickson, 37 S. D. 300, 157 N. W. 1062; Schouler on Wills, § 226; 40 Cyc. 1146). As said in Alexander on Wills, 491:

"Undue influence is associated with testamentary capacity, since the amount of influence necessary to affect the testator varies according to the strength of his mind."

[6] The burden is upon a contestant to establish undue influence. Ekern v. Erickson, supra. To sustain such burden, however, it is only necessary that there be a preponderance of the evidence showing undue influence. Schouler on Wills, § 242; Alexander on Wills, 931. But, as above noted, where the will contains unjust or unnatural provisions, it demands close judicial

scrutiny; the onus devolves upon the proponent to prove a reasonable explanation of the unnatural character of the will; there must be fair proof that the testator had mental capacity to comprehend its import; and the court must, from all the evidence, be led to believe that undue influence did not produce the unjust or unnatural disposition.

[9-12] Undue influence is not usually exerted in the open, and it is therefore usually solely through inferences drawn from surrounding facts and circumstances that a court arrives at the conclusion that a will is the product of undue influence working on the mind of the testator. Schouler on Wills, § 242. The relations of the parties, the conditions that surround them, the attitude that they occupy towards each other, the influences that control their actions (Gross v. Courtley, 161 Ky. 152, 170 S. W. 600), the habits and inclinations of the testator, his purposes and wishes expressed at times and under conditions lending verity to his statements—all furnish guidance for the court. The keeping of the existence of a will secret from those who have an equal right to know of its existence is a badge of undue influence. Watkins v. Brant, 46 Wis. 425, 1 N. W. 82. Declaration of testator made previous to the execution of the will, and indicating a purpose inconsistent with the provisions thereof, "is competent and relevant, in connection with other evidence, as tending to show susceptibility to undue influence." Ekern v. Erickson, supra; Schouler on Wills, § 242, p. 292. And it is also competent and relevant on the question of testamentary capacity. Alexander on Wills, 493, 494.; Redfield on Law of Wills, 537; Sheehan v. Kearney, 82 Miss. 688, 21 South. 41, 35 L. R. A. 102. In this latter case will be found a very exhaustive discussion and resume of the authorities upon the competency of such declaration as proof of undue influence. While mental delusions, which are not connected with or have no effect upon the testamentary act, are not sufficient to invalidate the will (Irwin v. Lattin, 29 S. D. 1, 135 N. W. 759, Ann. Cas. 1914C, 1044), yet evidence of such delusions are competent upon the question of general testamentary capacity.

[13, 14] Appellate courts should hesitate to reverse the decisions of trial courts on questions of fact, and will do so only when it seems clear that its findings are contrary to the clear

preponderance of the evidence, Hackett v. Hackett, supra. We agree with the court in Ott v. Boring, 139 Wis. 403, 121 N. W. 126, that in order that there be a "clear" preponderance, "requires the preponderance to be so apparent as to manifestly outweigh any probable legitimate influence upon the triers [court] of those advantages for discovering the truth which the reviewing tribunal cannot have." But the rule, requiring a clear preponderance of the evidence to sustain a reversal does not apply where it appears that the trial court applied wrong rules of law to the evidence. Kelley v. Crawford, 112 Wis. 368, 88 N. W. 296; In re Ball's Estate, 153 Wis. 27, 141 N. W. 8.

[15, 16] In the light of the above, and keeping especially in mind the rule that the burden of establishing testamentary capacity rests upon the proponents of this will, and the further rule that, if the provisions of the will are apparently unjust or unnatural, it demands most close judicial scrutiny, and requires proponents to establish some reasonable explanation for such unjust or unnatural provisions—two rules which we feel certain the trial court did not fully recognize—we will review some of the most salient facts disclosed by the evidence.

James Golder and his wife separated about the year 1906, and were divorced in 1910. They had five children; one son, who died prior to his father, and the girls hereinbefore mentioned. At the time of this separation the youngest girl was some 11 years of age and the oldest one 17. The three younger girls remained with their mother; the oldest girl and the boy were away at school, where they remained until old enough to go out for themselves. During vacations the oldest girl spent a part of her time with the mother, and the son was with her more or less. There is no evidence but that the best of relations existed at all times between the children and their parents—there is not a word of evidence that any one of the children took sides as between the parents. The father never provided a home for any of the children, but some 4 years after the separation, and after the son and Jean had taken up claims, he lived with one or the other until Jean married. There is no evidence that he ever blamed or felt harsh toward any one of them for residing with the mother, or that he ever had any trouble with any one of them, except when he was

drunk. The evidence, other than that of respondents, shows that the relations between Golder and the appellants were all that they should have been, and it clearly shows that he had an especially tender feeling toward the younger, whom he was wont to call his "baby." Absolutely no just or natural reason appears why, in disposing of his property Golder should prefer Theodora over either appellant, even if it might be claimed that there was some evidence of a reason for preferring Jean over appellants. It does, however, appear that Jean used her influence in favor of Theodora. Jean lived at Winner. From about July 1, 1914, and until his death, Golder, who for some time had been living at Dallas (a town not far from Winner), lived with Jean. This was at the request of Jean. Theodora also lived with her. Ellen and Marguerite both lived at some distance from Winner, and their mother, a school-teacher, made her home with Ellen during her vacations.

At the time this will was made, Jean owned 160 acres of land; her husband was in the mercantile business; they owned their home, and had one child; Theodora was unmarried, and undoubtedly without property; Ellen was married, had at least two children, lived in home owned by her husband and herself, which home was worth $2,500 and was mortgaged for $850; Marguerite was unmarried, a domestic, and undoubtedly without property. Golder owned 200 acres of land near Winner; held note of $11,000 secured by first mortgage on three quarters of land in Nebraska; had some $3,000 on deposit in a bank; and held some $5,000 of unsecured notes, $4,200 of which were executed by Jean's husband.

Golder had for years been seriously addicted to the use of intoxicants, and, for several years prior to his death, he was afflicted with Bright's disease. The evidence shows that Golder was approaching the last stages of this disease when he came to Winner. One doctor, who had made a special study of Bright's disease, and who had treated Golder more or less for some time before Golder moved to Winner, was called to Winner to consult with the doctor then caring for Golder. This was on July 30th, either two or three days after the will was signed. This doctor testifies that Golder was in a condition of semicoma, in the very last stages of Bright's disease; and the testimony of respondents themselves is that just before this—within a day or two at most, and per-

haps the very day on which the will was executed—Golder had been much worse; had been unable to get out of a chair for two days; was afflicted with a sort of coma. This doctor testified that Golder's mentality on July 30th was dull on account of uremic poisoning; that he could not concentrate his mind, and was not in full possession of his ordinary intellect. He states that in case of a person in Golder's condition delusions and hallucinations might be apparent; and the undisputed evidence of disinterested witnesses shows that Golder did have delusions and hallucinations. He pronounced him of unsound mind, and testified that such unsoundness of mind had extended back at least a month, and was of a continuous nature. The doctor in whose continuous care he was from as early as July 15th testified to delusions which he had first noticed on July 15th, and also testified that from that time Golder rapidly grew worse until the time the other doctor was called in consultation. This doctor saw him every day but one from July 15th until he died, and he swears that during much of this time he was in a stupified condition.

A doctor who never saw Golder was called as a witness by respondents. This witness admitted that, where there is much uremia, it is bound to affect the mind of the sufferer; and he admitted that delusions might result from such poisoning. The two subscribing witnesses, neighbors of respondents and related by marriage to Jean, considered Golder of sound mind. One of them admits she knew Golder very slightly. A very close Dallas friend of Golder and his business confident, who came to Winner to see him the last of July, testified that there had been a great change in his condition since he left Dallas; that his memory was gone. One Sjoblin, who had excellent opportunities to know whereof he testified, testified as to Golder having delusions, and that he considered him of unsound mind. Other disinterested witnesses testified as to Golder's physical and mental condition; that he was incoherent, his mind wandered, was not in full possession of his mental faculties; that he was "absolutely off." One witness, called by respondents, testified that Golder appeared to be of sound mind about the middle of July. Another says he was of sound mind, but there is no evidence that he saw him after May. Another, who lived part of the time at Jean's home after Golder

came there, thought him to be of sound mind. Appellants testified to Golder having delusions and to other facts evidencing mental and physical weakness; while respondents testified that they never knew of their father having delusions, and both testified to his mental soundness. The attorney who drew the will testified to the conversation he had with Golder before the will was drawn, to how Golder related the family history in explanation of his reasons for disposing of his property as he did.

[15-17] In answer to hypothetical questions asked the several doctors, they answered, in-effect, that if, within several weeks before his death, Golder detailed all his property that he had and told about his past life and about his children, and stated what he wanted to do and the reasons he gave were true in fact, he was possessed of sufficient mentality to understand his property, and his relatives, those for whose being he was responsible. Without such answers to hypothetical questions, the proof of Golder's mental incompetency was, to our minds, overwhelming. The only basis for such hypothetical questions is the conversation between Golder and the attorney, and there is no evidence that he ever mentioned to the attorney any of his property except the land, while there is evidence from other witnesses that Golder did not have a clear recollection of his property. The evidence of the attorney was objected to upon the ground that it was a communication of client to attorney and privileged. We are inclined to think the evidence properly received, but solely upon the ground that an attorney who drafts a will is presumed to impartially represent the estate and to be without bias. This presumption may hardly be justified in relation to an issue as to testamentary capacity, as any attorney would naturally hesitate to admit that he had drawn a will for a testator whom he considered to be without testamentary capacity. In this case we find this witness not remaining neutral, but appearing in court upon the trial as one of the attorneys for the proponents of the will. Knowing, as he must, that he would be called as a witness to testify to matters going to the merits of at least one issue raised by contestants, he should, in conformity with the nineteenth Canon of Ethics adopted by the Bar Association of this state and the American Bar Association, have refused to act as attorney for appellants. His evi-

dence is not entitled to that credence to which it would have been entitled if he had preserved that neutrality that a high sense of professional propriety would have demanded.

It appears beyond all question that Golder was naturally a hard-headed, obstinate person, one not easily influenced; and yet the almost undisputed evidence was to the effect that, after he came to Winner, he was easily influenced.

One old friend of Golder testified to Golder's having, about the Holidays, 1911, talked to him of all his girls, and pledged him to look after their interests; that he told Golder that, in his condition, he ought to make a will, and that Golder answered:

"Blame it, I don't want to make a will, Uncle Tom. You know the laws of the state. I have no difference between these four girls. * * * The laws of the state are better than any will. Why should I make a will?"

Another old friend testified that Golder told him about dividing his property among his children, and indicated an especial interest in Marguerite. These last conversations were some years before Golder died, but, both of them clearly show that Golder had, toward appellants, a fatherly feeling at a time when respondents contend Golder felt unkindly toward them because they lived with their mother. Another clearly disinterested witness testified that, shortly before the time Golder executed the will, he told him that he intended to give his property to all of his girls; and a witness, called by respondents, testified that on July 23d, probably the day before the attorney received his instructions as to the will, Golder said he was going to give his property to Jean's child. He told another witness, probably about May, 1914, that he was going to will his property to Jean, Theodora, and the child.

[18] . A close friend of Golder testified about Golder's going to see one of Ellen's babies soon after it was born, and that Golder said he was going to give it $500. There is also evidence that he received letters from Ellen. And yet it is respondents' theory that Golder fairly hated his daughter. In fact Jean goes so far as to testify to her father's gloating over the fact that he had his will fixed so that Ellen would not get any of his property. This daughter sought to testify that she had never had any trou-

ble with her father. This evidence was wrongfully excluded on the ground that it related to transactions between this appellant and the testator.

It is undisputed that Jean talked with her father in relation to the disposition of his property, and was influential in getting him to give Theodora the $4,000. It is also undisputed that she opposed notifying appellants of the serious illness of their father, and that it was against Jean's will and at Theodora's demand that they were notified of his condition. She attempts to justify her acts on the ground that she was following her father's desires. But it does not appear that any one else knew that such a desire existed, and surely her husband and Theodora would naturally have known of it if it had existed. Appellants were not notified of their father's condition until one or two days after the will was executed. They came immediately, and were with him for nearly a month, and until his death, and yet it is undisputed that Jean, while apparently treating them friendly, they staying at her home, did not advise them that their father had made a will. It is undisputed that as soon as the will was executed she went to get papers belonging to her father. It is also undisputed that she requested Ellen not to speak to her father of property matters. She testified that this was because her father complained that Ellen annoyed him by advising him that he ought to get his property matters fixed up. Ellen denied that she talked to her father about such matters.

It appears from the clear preponderance of the evidence—being that of appellants and two disinterested witnesses as against the testimony of Theodora—that, when this will was first offered for probate, Theodora denounced the same as "crooked," and laid the unjust and unnatural provisions thereof to the influence of Jean. There is evidence of a disinterested witness that some settlement was made by Jean with Theodora. This probably explains why Theodora did not herself contest this will, as it is apparent she at first contemplated doing.

[19] We are satisfied, beyond question, that the respondents willfully committed perjury when they testified that they never knew of their father's delusions. The fact that they swore falsely to this destroys the probative force of their other testimony.

[20] It is respondents' theory that Golder disposed of his property as he did because he had divided his property with his wife when they were divorced; because Ellen and Marguerite remained with their mother and would probably receive what she had; because he did not feel kindly toward appellants, and especially toward Ellen; because he had lived with Jean considerably. The evidence shows that Theodora also remained with the mother until 1911, and there is absolutely no evidence that she ever showed any greater interest in her father or his welfare than either Ellen or Marguerite. The overwhelming weight of the evidence shows that if Golder had any daughter whom he looked upon with especial favor, it was his "baby," Marguerite. The evidence does not reveal what property Golder had at the time of divorce, and, there is absolutely no evidence to show that, when Golder made the will, he believed, or had any reason to believe, that his former wife had any property. His "baby," for whom he always appeared to have a very strong affection, appears to have no property or income other than that received for domestic service. Jean, least of any of the daughters, needed financial assistance. The only witness that gave any evidence that gave any support to the above theory, other than respondents themselves, was the attorney who drew the will, except a statement by Golder to one witness to the effect that he was going to remember Jean in his will because she had been good to him, and a remark to the witness, to whom he said that he was going to give his property to Jean, Theodora, and the child. This witness testified that Golder said that the other two children would be taken care of by their mother. One of these statements was about the date the will was made. The date of the other does not appear.

[21] We are therefore of the opinion that, while there might not be in the record before us sufficient from which to conclude that the will was the result of undue influence, provided such record showed Golder to have been well and mentally normal at the time he executed this will, yet, in view of his enfeebled condition, both physical and mental, and the unjust and unnatural provisions of such will which the proponents have failed to reasonably explain, the clear preponderance of the evidence establishes that Golder, if not absolutely mentally incompetent to make a will, was

so controlled in his act in making the will in question by the undue influence of his daughter Jean Shaver that the same was not his free act.

The judgment and order appealed from are therefore reversed.

McCOY, J. (dissenting). Whether or not the said will was the result of undue influence was purely a question of fact. Likewise, also, whether or not the decedent had sufficient mental capacity to execute said will was purely a question of fact. We are of the view that there is no evidence, either direct or circumstantial, appearing in the record sufficient to warrant us in holding that the findings of the trial court upon either of these issues were against a clear preponderance of the evidence. Upon the issue of undue influence we are of the opinion that the record presents no evidence tending to sustain the contention of appellants in relation to that issue. We realize and fully appreciate that undue influence, like fraud, is most oftentimes practiced in secrecy, and can only be ferreted out and proven by surrounding circumstances. It appears that decedent was residing at the home of his daughter Jean at the time of the execution of this will; that she was his favorite daughter; that he was advanced in years and was suffering from the poisons of Bright's disease; that the daughter Jean had the opportunity to practice undue influence upon him; and that he was in a weakened mental and physical condition to such an extent that he might have been more easily influenced than a younger person possessed of more mental and physical vigor. Decedent in his lifetime had been addicted to the excessive use of intoxicating liquors, and had deposited for safe-keeping with a certain saloon keeper a large amount of valuable securities and other property, among which were notes executed by the husband of Jean, and on one or more occasions his daughter Jean had demanded the possession of said property from said saloon keeper, which demand was refused. The daughters Ellen and Marguerite were not notified by the daughter Jean of the serious physical condition of the father until after the execution of the will; and, after the arrival of the daughters Ellen and Marguerite at the home of Jean, she requested the two sisters not to talk about business matters with the father. Surrounding circumstances of

this character were the only ones appearing. We are of the view that such circumstances are not inconsistent with the utmost good faith and perfectly honest intentions on the part of Jean, when taken in connection with the particular relations of the Golder family shown to exist. Such circumstances are not necessarily evidence of undue influence.

On the issue as to whether the deceased was of sound and disposing mind there was conflict in the evidence. It appears that he had been seriously affected with Bright's disease from some time in the month of June preceding, and that at times he was apparently in lucid, normal mental condition, although physically weak; while at other times he was apparently to some extent mentally deranged. At the time of the drafting of the will and prior to its execution he informed and directed his attorney as to the manner in which he desired, by said will, to dispose of his property, and also stated the reasons why he desired to so dispose of the same. It is urged by appellants that the act of decedent in practically disinheriting the appellants was an irrational and unnatural act tending strongly to show senile dementia and lack of mental capacity to make a will. Ordinarily such an inference might reasonably be inferred, but in this case it appears that some years prior to the making of the will James Golder and his wife were separated by divorce; that a division of property between them at that time was made; that two children, Jean and George, sided with the father during the family troubles, and that the other three children, Ellen, Theodora, and Marguerite, remained with the mother; that within a short time after the separation, the father, Jean, and George, removed from the state of Nebraska, where they were residing at the time of the family separation, and came to Tripp county, this state, where Jean and George took up government lands, and that the father and Jean and George were closely associated together, and that the father lived with Jean on her claim, and that she taught school part of the time; that decedent also resided with George a part of the time on his claim; and that after Jean was married, the father spent much of his time with her. The brother George, unmarried, died some time prior to the execution of the will, and the father inherited his property. It also appears that the daughters Ellen and Marguerite remained

with the mother, and never, or seldom, saw the father; that the daughter Theodora, some time prior to the father's death, came to Dakota and visited the father, and became quite friendly with him, and exhibited quite an interest in his welfare, and made her home part of the time with Jean. Under these circumstances it may readily be seen why decedent desired or had reason to desire the disposition he made of his property. He stated to his attorney who drafted the will that the daughters Ellen and Marguerite would no doubt inherit and succeed to the property owned by the mother. Viewed in the light of these circumstances, we are of the view that his act in practically disinheriting Ellen and Marguerite indicates a discriminating and disposing mind rather than the contrary; that under the circumstances of this case the act of the decedent in practically disinheriting two of his daughters was not an unnatural act.

The trial court heard and saw all the witnesses, and was in a much better position to determine who, if any, of the witnesses committed perjury than is this court. Under the rule that should be applied, where there is a substantial conflict in the evidence, as there is in this case, the findings of fact made by the trial court should not be disturbed unless against a clear preponderance of the evidence. A clear preponderance of evidence against a trial court's finding must necessarily be a preponderance so decided as to leave but little room for reasonable doubt on the question. Ott v. Boring, 139 Wis. 403, 121 N. W. 126; Rankl v. Schmidt, 133 Wis. 103, 113 N. W. 423; Endress v. Shove, 110 Wis. 141, 85 N. W. 651. We are of the opinion that no such clear preponderance exists in this case. We are also of the view that the question of burden of proof has no place in the determination of the questions here presented. The burden of proof relates solely to the question as to which party shall first go forward and submit evidence in substantiation of an issue made by the pleadings. Presumptions arising from the burden of proof rule should never be placed in the scale and weighed as evidence. After a case has been fully tried out upon the merits, the burden of proof rule ceases to have any effect, and the cause should then be determined upon the whole of the competent evidence regardless of which party might

have produced or offered the same. Elliott, Ev. §§ 91, 92, 93; Wigmore, Ev. §§ 2490-2491.

The judgment should be affirmed.

SMITH, P. J. (concurring specially in dissent). I regret that the exigencies of the conclusion reached seem to make it necessary in this case to ignore a rule long established and well understood by the profession in this state. In Spackman v. Gross, 25 S. D. 244, 126 N. W. 389, this court held that a review of the finding of a trial court authorized by Code Civil Procedure, § 463, is not a trial de novo on the evidence, but is restricted by the rule that the credibility of the witnesses is for the trial court; and, unless the finding is against the evidence, taking the credibility as found by the trial court, the finding will not be reversed.

In Township of Blooming Valley v. Bronson, 29 S. D. 41, 135 N. W. 678, Mr. Justice Whiting said:

"It was impossible for the trial court to harmonize the testimony given by the several witnesses, but it was therefore necessary for such court, in view of all the surrounding circumstances and facts and in view of the apparent credibility or lack thereof on the part of the several witnesses, as same appeared from seeing the witnesses and hearing their testimony, to determine which witnesses were entitled to the greater credit; and this court, when it has not the opportunities presented to the trial court for determining these matters so material where the evidence is conflicting, would certainly not be justified in overturning and reversing the findings of the trial court."

In Gingles v. Savings Bank, 33 S. D. 351, 146 N. W. 596, this court said:

"We are convinced that the credibility of witnesses who testified at the trial must have been a controlling factor in the decision of the trial court, and in such cases it would require most convincing circumstances to justify this court in reversing the finding of the trial court."

This rule was again affirmed by this court in Watt v. Alyward, 34 S. D. 228, 147 N. W. 978.

The extended discussion in the majority opinion of the conflicting evidence of witnesses who testified at the trial is a most

convincing demonstration of the propriety of applying the rule in this case.

The trial court had before it all the witnesses, including the attorney who drew the will, heard their evidence, witnessed their demeanor while testifying, and could judge of their apparent truthfulness and sincereity. The deliberate judgment and findings of that court upon conflicting evidence should not be set aside by an abstract argument and an ex cathedra judgment.

The order and judgment of the trial court should be affirmed.