## In Re BROWN'S ESTATE.

### (224 N. W. 942.)

(File No. 5772. Opinion filed April 13, 1929.)

*Helm & Lewis,* of Hot Springs, for Appellant.

*Williams, Sweet & Tscharner,* of Rapid City, and *Wilson & Wilson,* of Hot Springs, for Respondents.

POLLEY, J. This is an appeal from a judgment reversing a judgment of the county court of Fall River county, and setting aside what purports to be the last will and testament of Anna C. Brown, deceased. The property involved consisted of a small house in the city of Hot Springs, some $200 or $300 in money, and a small amount of personal property. The contest is between a sister of the deceased who is named as the beneficiary under the will, and John Brown, husband, and Lillie Greenlee, an adopted daughter of the deceased, who claim the property as heirs at law of the decedent.

The will was denied probate by the circuit court on the sole ground that testatrix did not have sufficient mental capacity to make a disposition of her property at the time the will was executed.

The evidence shows that for many years prior to her death Mrs. Brown lived practically alone and supported herself by working as a laundress. About the first of September, 1923, she became afflicted with pneumonia. She sent for Mrs. C. M. Williams, a neighbor with whom she had been acquainted for some 22 years. Mrs. Williams went to see her and did what she could for her for a couple of days; then, in order that she might have better care, moved Mrs. Brown to her house. This was on Monday, the 10th

day of September. Mrs. Brown remained there all the following week and was confined to her bed all of the week except Friday, on which day Mrs. Williams took her over to her own house; but what was her purpose in going, or how long she stayed, does not appear. On the following morning, Mrs. Williams called Dr. Rogers, a practicing physician in Hot Springs, who came, and after ascertaining Mrs. Browns condition advised that she be taken to the hospital. Mrs. Williams took her to the hospital and appears to have remained there with her throughout the greater part of the day and the following night. During the day Mrs. Brown requested Mrs. Williams to get Mrs. Wasson. This was done. Mrs. Wasson was of the same religious faith as Mrs. Brown, and most of her time throughout the remainder of the day and night appears to have been taken up with matters pertaining to Mrs. Brown's spiritual welfare. During the evening Mrs. Brown expressed a desire to make a will. Mrs. Williams asked Dr. Rogers to draw the will. He declined and suggested that Mrs. Williams do it herself, and this she proceeded to do. She first ascertained from Mrs. Brown the disposition she wished to make of her property, then went to the desk in the office of the hospital and prepared the instrument now in the record as Exhibit A. She then took it to Mrs. Brown and read it to her. She said it was the way she wanted it, and with the aid of Mrs. Williams signed it. Mrs. Williams, Mrs. Wasson, and Dr. Rogers were all present when it was signed. They all knew she signed it as her last will and testament, and they all signed it as witnesses.

It is the claim of contestants that at the time of the execution of the will decedent had not sufficient mental capacity to make an intelligent disposition of her property and that the will was not executed and witnessed in the manner required by statute, and upon these points the trial court made the following finding of fact: "V. That at the time the said instrument in writing, dated September 15, 1923, which instrument was at the trial of this Court identified as being marked Exhibit 'A' and which instrument was alleged by the proponents to be the Last Will and Testament of said Anna C. Brown, was written by Mrs. C. M. Williams, only seven hours before the death of Anna C. Brown, deceased, and while in her last sickness, and in form executed at a time when the said Anna C. Brown was in a condition of coma, seriously ill, very weak and

only partially conscious, and when she was not of sound and disposing mind and memory and did not possess sufficient testamentary capacity to make a will or understand the consequences of her acts or to make a disposition of any of her property; that at the time said instrument in writing was made and in form executed, the said Anna C. Brown, now deceased, was not of sufficient mental capacity to understand and did not understand the contents or nature of said written instrument and that she did not in form execute said written instrument as her own free act and deed, with any understanding of the same."

We believe that this finding is not only unsupported by the evidence, but that it is contrary to the preponderance of the evidence. That the testator was very sick and weak physically cannot be questioned. While this fact is material, it is not controlling, so long as she had sufficient mental strength to make an intelligent disposition of her property. Upon this point the evidence showed that the decedent was a woman of at least average intelligence. One witness described her as being strong willed. When she realized that she could not recover, she expressed a desire to make a will. Mrs. Williams and Mrs. Wasson were present. She said she wanted to give her property to her sister, Sena Johnson, who resided at Pontiac, Ill. She also said that she did not want her husband or her adopted daughter, Mrs. Greenlee, to have any of it, and their names were mentioned in the will only because she thought it was necessary to leave them something. Mrs. Williams made an outline of the will as Mrs. Brown gave her the directions, and it is not claimed that at that time she was not in the full use of her mental faculties. Mrs. Williams then went to the hospital office and prepared the will. How long she was gone the record does not show, but when she returned with the will prepared as it now appears in the record, it was read over to Mrs. Brown in the presence of Mrs. Wasson and Dr. Rogers, and it is not claimed by either of them that the will as so read was not just as decedent had directed that it should be. Mrs. Williams testified that when she read the will to Mrs. Brown she said, "That is good, it is all right," or words to that effect. She then held Mrs. Brown's arm while she signed the will.

Mrs. Wasson testified as follows: "I was summoned to the Sister's Hospital in Hot Springs on September 15, 1923. Mrs.

Williams came and got me. Mrs. Brown was sitting up in bed there when I reached the hospital. She could talk and understand everything I told her. Mrs. Brown was Norwegian, I am Swede. Mrs. Brown talked in Norwegian and I can talk it. I always asked her in English and she answered in Norwegian. She was short of breath and, you understand, she didn't converse like I am now, but she understood and said what she wanted. Her answers were rational to my questions. I saw Exhibit 'A' when it was written in Mrs. Brown's room in the Sister's Hospital. I saw Mrs. Brown sign the signature 'Anna C. Brown' on the third page of Exhibit 'A.' She signed it in her room in the Hospital on the 15th day of September, 1923, if I remember correctly. It was the same day as Mrs. Williams took me to the hospital, about the middle of the evening, nine or ten o'clock probably. I saw Dr. Rogers sign the name J. S. Rogers on the third page. Mrs. Williams signed the signature Mrs. C. M. Williams on the third page. Just met Dr. Rogers that evening. Have seen his since. Am acquainted with Mrs. Williams. The third signature on the page as witness is mine. All those signatures were placed on there the evening of September 15. Mrs. Brown signed her name first, and the witnesses signed after her. The three witnesses were right in the room when Mrs. Brown signed, and also when each signed. Before that instrument was drawn and signed that evening Mrs. Brown spoke to me about disposing of her property on her death. First spoke of it in the evening, after supper. I can't tell just what she said because there were other things said before prior to that but I asked her if she had got everything fixed all right and she said 'No,' then I asked her if she wasn't going to and she said 'Yes' or nodded her head—she spoke very low. I asked her what I should do with it and if she wanted us to make a will and who to and she went on and told. She told me to make it out to her sister; I was not acquainted and I asked her where she was and she told me; then I says to her, 'I can't do that'; I asked Mrs. Williams to do it and she asked her if that would be all right and she said 'Yes.' Mrs. Williams was there when we had this conversation. She (Mrs. Brown) told me to have it made up to her sister; I wanted to know where she was; she gave me the names and all about it. Then I think Mrs. Williams said something about brothers and I asked if she had

more than that; she said she had a brother—no, two brothers. Well I wanted to know what she was going to do with it and she said, 'Give it all to my sister.' I said, Don't your brothers get anything?' and she said, 'No.' I think Mrs. Williams said something about Mr. Brown and I asked her what she was going to do. I says, 'Is that your husband?' and she said 'Yes.' I asked 'What are you going to do about this?' and she said, 'Nothing, he is not mine.' I didn't know anything about Mrs. Greenlee then. I think Mrs. Williams said something about her and I asked her if she had any more relatives. I believe she said she did, and I asked her 'What are you going to do with your daughter?' and she said, 'She isn't mine.' I said, 'How is that? Where does she live?' She said, Rapid City.' I said, 'What are you going to do about her?' and she said, 'Nothing.' I says, "Why?' She said, 'She don't care anything about me, she didn't even come to see me when I was sick.' I said, 'You can't do that way.' She told me to write it down that all the property went to her sister and all she reserved was the two hundred dollars she was going to have for her burial; I told her she couldn't do it that way and do it legally. I think she suggested something about what she could do; I told her she would have to give something. I tried to beg her to give her daughter something, but she wouldn't give her anything. I begged her to let her daughter come and see her because she was her daughter. Her daughter was not in town but we looked for her every minute. I said that wasn't fair and she said she had children and would annoy her and I said, 'We will keep the children in the hall'; she said, 'No, she don't like me anyhow.' I don't remember any other conversation about her property before the will was drawn; she told me what she had, her home and what was in it; I guess that was all. At the time the instrument was signed she was sitting up the same as you are—she didn't seem to be in pain, but she was short of breath. She knew what she was doing. After that instrument was drawn Mrs. Williams read it to her. Mrs. Brown said, 'All right' or some such words; I didn't try to remember it but I know she sanctioned it. Dr. Rogers, Mrs. Williams and myself were in the room at that time. Yes, we called it her will, and she said 'all right.' After it was read she signed it. I think Mrs. Williams had her arm or wrist or something, but it is because she was such a poor writer

in the first place. After she signed it the other witnesses signed it. That was along within half an hour. No, none of the witnesses went out of the room after she signed it. All four of us stayed in the room. I couldn't say whether Mrs. Brown did or did not see me sign it, but I was right in front of her where she could see me. It was a small room. I don't think there was anything more said about property after the will was signed. She told me she had that money and naturally I wanted to know where it was. I asked 'Where is it?' and she said 'In my trunk.' She said there was two hundred dollars in the trunk. Mrs. Williams and I later went to look for it. We did not find it. We found a certificate of deposit for $200 on the People's Bank if I remember right. At the time the will was signed the house key was given to me. I asked Mrs. Brown where the key was to the trunk because I did not have it. She said it was over to the house on top of the cupboard. I didn't find it there and lifted up the mattress on the bed and there was a bunch of keys, the trunk key among them. I visited with Mrs. Brown a number of times before her sickness and she visited me. Talking with her at different times. I couldn't see but what at the hospital that night, her mind was perfectly all right; if she wasn't how could she tell me the address and names so prompt; I didn't know them; they were all strangers to me."

A very severe cross-examination failed to change or modify this woman's testimony in any manner. None of her testimony was disputed and no attempt was made to impeach her. Mrs. Brown told Mrs. Wasson and Mrs. Williams she had some money in a trunk in her house and asked them to get it and take care of it. After the will was signed, they went to the house, where they found a small amount of money and a certificate of deposit for something over $200. They took this back to Mrs. Brown and she turned it over to Mrs. Wasson. Believing they needed written authority from Mrs. Brown, they prepared and she signed Exhibit I, which reads as follows: "Hot Springs, S. D., Sept. 15, 1923. This is to certify that all money, Liberty Bonds, cash or papers and belongings of Mrs. Anna C. Brown are to be turned over to Mrs. D. W. Wasson. Signed by Anna C. Brown. Witness Miss Rochford, Mrs. C. M. Williams, C. M. X."

This paper was signed by Mrs. Brown an hour or more after the will was signed, and it is not contended that she was not in the full use of her mental faculties at that time.

Dr. Rogers, the attending physician, was a witness at the contest in the county court and also at the trial in the circuit court. In the county court he testified that in his opinion Mrs. Brown was mentally capable of making a will when she signed Exhibit A. He also signed an affidavit in which he said she "was of sound and disposing mind and memory and not acting under duress, fraud, undue influence, menace or misrepresentation." But for some reason, not explained in the record he changed his testimony at the trial in the circuit court, and when asked the question, "Was Mrs. Brown at the time she signed the will, mentally competent to make a will?" answered, "No." He did not claim that he had learned anything after he testified in the county court or discovered anything relative to Mrs. Brown's condition that he did not know at the time that she signed her will. He further testified: "I went ahead and signed as a witness. Mrs. Brown seemed to understand what Mrs. Williams said to her. I think Mrs. Brown knew what she was doing at that time. Her answers were all right; her answers to Mrs. Williams were rational. I think she knew she was signing a will,—I believe she understood the contents of that will; if prior to the evening of September 15 this woman had discussed and apparently made up her mind what she wanted done with her property, I think she was capable of making a will that night, and Mrs. Williams told me at that time Mrs. Brown had expressed a desire to make a will before, to her; if that was the case, she knew in her own mind what she wanted,— she was capable of telling Mrs. Williams what it was. At four o'clock in the afternoon she would not have had much more capacity than two or three hours later. At that time she could have decided she wanted to make a will and known her property and her beneficiaries." He further testified: "I did not hear Mrs. Brown speak from the time I got there. She expressed herself by nodding; I can't say Mrs. Brown was in a stupor at the time the will was signed; she acted that way all the time from the time I first saw her at Mrs. Williams—to my mind it was sort of her character."

On behalf of contestants, various witnesses testified that at different times prior to her death she had talked about her property and who was to have it after she was gone; that on those occasions she had said that it was to go to Mrs. Greenlee, her

adopted daughter. On the other hand, witnesses for the proponents testified that they had heard her say that upon her death she wanted her property to go to her sister. It is not very material what she may have said on these occasions, if she was capable of knowing what she was doing with her property at the time she signed her will.

█ It is argued by the contestants that it was unnatural that she should leave her property to her sister in preference to her husand and daughter. In view of circumstances shown by the record, it does not seem to us to be either unnatural or unusual that she should leave her property to her sister in preference to her husband and Mrs. Greenlee. The evidence shows that this sister, who is named in the will, was very old, in poor health, and in indigent circumstances. There does not appear to have been any bond of affection between either herself and her husband or Mrs. Greenlee. She and her husband had not lived together for 20 years. He lived on a ranch out in the country, while she lived in town. During this time she supported herself and accumulated the little property she left by taking in washing. The evidence shows that he was in town and visited her while she was at Mrs. Williams, during the week just prior to her death. He remained there but a short time, when he went home. He testified that she sent him out to get a load of wood, but he did not take in a load of wood, nor did he go back to see her nor make any inquiries as to her condition or give himself any concern whatever in regard to her until after her death.

Mrs. Greenlee was married and lived in Rapid City. Whether she knew of her mother's sickness before she went to the hospital the record does not show, but she was notified by telephone during the afternoon of the 15th that her mother was sick and at the hospital. At that time she could have taken the train and been with her mother in a very short time, but instead of doing that she telegraphed to other parties in Hot Springs for a detailed report on her mother's condition, and before she received a reply to her telegram, the train for Hot Springs had gone, and her mother's condition was not a matter of sufficient concern to her to prompt her to go by private conveyance.

Helen Rochford testified on behalf of the contestants. She was the nurse in care of Mrs. Brown the night of September 15th.

She had had four months' training in a hospital in Casper, Wyo., and had worked in the hospital at Hot Springs since the 15th day of August, 1923. She first saw Mrs. Brown about 7 o'clock in the evening. She testified that Mrs. Brown was in a state of coma all the time after she first saw her, "a coma state, a sort of prolonged unconsciousness." But she probably did not know the meaning of "coma." Webster's New International Dictionary defines coma as: "A state of profound insensibility, caused by disease, injury, or poison, from which its is difficult or impossible to rouse a person." Mrs. Brown was not in this condition, for this witness testified: "I tried to give her some nourishment; she would take it once in a while but I would have to give it to her with a spoon. She would open her eyes. He eyes were open when Dr. Rogers and Mrs. Williams and Mrs. Wasson were in there. They were conversing with her some of the time and she nodded or shook her head in answer to their questions. I was not there when the will was signed. That the coma state did not get any less any time after I went on duty. It was toward midnight that she began to get in that condition."

A very persistent effort is made by contestants' counsel to belittle the testimony of the witnesses Mrs. Wasson and Mrs. Williams. They are referred to repeatedly as interested witnesses. After a careful examination of the testimony of these witnesses, we fail to find anything that warrants this charge. Neither of them are interested in any manner or to any extent. Their testimony shows them to have been perfectly frank when on the stand, and bears the impress of truthfulness. The characterization of these witnesses as interested witnesses is not only unfair to them, but unwarranted by the facts.

Upon the entire record we are of the opinion that the evidence greatly preponderates in favor of the proponent, and that the will was properly admitted to probate by the county court.

The judgment and order appealed from are reversed.

SHERWOOD, P. J., and BROWN, J., concur.

BURCH and CAMPBELL, JJ., dissent.