# IN RE ESTATE OF HOBELSBERGER

## (181 N.W.2d 455)

(File No. 10668. Opinion filed December 4, 1970)

**Lacey & Lacey,** Sioux Falls, **Beardsley, Osheim & Wagner,** Watertown, for appellants.

**Gribbin & Burns and Thomas G. Ries,** Watertown, for respondent.

RENTTO, Judge.

John Hobelsberger died on July 19, 1967, survived by 27 nieces and nephews and seven grandnieces and grandnephews, his only heirs. In this proceeding the validity of a will which he executed on November 22, 1966, is challeng-

ed by nine nieces and nephews. Its admission to probate was sought by his designated executor.

The will in question, after providing for the payment of debts and funeral expenses, left the remainder of his estate to Phyllis Raml, a grandniece. In the event that she did not survive him the property was to go to her husband, Ralph Raml, who was also named executor. If neither of these survived the testator, it would then go to their son Thomas. His estate consisted of 160 acres of farm land in Codington County, South Dakota, appraised at $7,500 and cash, bonds and miscellaneous personal property valued at approximately $9,400.

The challenge of the contestants was based on the following grounds: (1) lack of testamentary capacity; (2) undue influence on the part of the Ramls; and (3) improper execution. The county court, without a jury, held a hearing on the matters in issue and made findings of fact favorable to the proponent and admitted the will to probate. From this the contestants appealed to the circuit court. After hearing testimony for three days and considering the briefs of both parties, the court made similar findings and entered judgment dismissing the appeal and affirming the order of the county court. This appeal is from that judgment.

The testator at the time of executing the will in question was 80 years of age. He had never married and lived alone on his farm near Kranzburg, South Dakota. He had resided in the same general area all of his life. The Ramls lived on and operated a farm about two miles from his. They had made their home there since 1950. Over the years they rented a portion of his farm and for about five years before his death they rented it all, but he continued to reside on it. During these years they pretty much looked after him. Their relations with him seem to have been friendly and cordial and their visits with each other rather frequent. During late years the other heirs had not lived in as close proximity to him nor have they been with him as often as the Ramls.

While attending church on Sunday, October 23, 1966, he became ill during the service and was taken to the St. Ann's hospital in Watertown, South Dakota, by Mr. Raml.

It was thought that he had a heart attack. On October 24th he became the patient of Doctor Brevick who diagnosed his indisposition as intermittent cerebral insufficiency. He remained there until November 19th, when he was transferred to the Burgdorf Nursing Home in the same city. During his hospitalization he told the Ramls that he wanted to see an attorney about some legal matters and the preparation of a will. He did not indicate any particular attorney, but suggested that they ask their lawyer to call on him. After several requests they mentioned the matter to Thomas Green who had acted as their attorney.

About a week later Mr. Green went to the hospital and interviewed the testator. This was about the 10th of November. After discussing some apparent defects in the title to his farm which he wanted corrected, the testator told the attorney what provisions he wanted in his will. Their discussion lasted about 45 minutes. After the completion of the interview the attorney returned to his office, with his notes, and prepared a will in compliance with his instructions. About the 17th of November he took the will to the hospital. Because testator's brother, who later predeceased him, was in the same room as a patient it was not discussed or executed. Soon after his transfer to the nursing home he sent word by the Ramls that he wanted to see the attorney about his will.

On November 22nd the attorney and a secretary went to the nursing home. The Ramls were there visiting the testator. They had not known that the will was to be signed that day. It was read to him by the lawyer, after which he indicated that it was the way he wanted it. The testator subscribed it with his mark in the presence of the attorney and secretary as attesting witnesses. It was then taken to the lawyer's office where it remained until after the testator's death. On December 27, 1966, he was dismissed from the home because he had become a problem patient. He was readmitted to the hospital while a facility was found available to care for him. On January 3, 1967 he left the hospital and was taken to a nursing home in Clear Lake, South Dakota, where he remained until his death.

That the testator was aged and infirm when he executed the will is not questioned. As stated, the doctor diagnosed his illness when first admitted to the hospital as intermittent cerebral insufficiency. He did not classify it as a stroke. Apparently it was more in the nature of a fainting spell. He testified that during his hospitalization the testator had an occlusion of a cerebral artery. This he characterized as a mild stroke.

While these facts are material on the question of testamentary capacity they are not controlling. In re Hackett's Estate, 33 S.D. 208, 145 N.W. 437; In re Brown's Estate, 55 S.D. 53, 224 N.W. 942; In re Blake's Estate, 81 S.D. 391, 136 N.W.2d 242. The matter in issue is the condition of his mind when the will was executed. One may be physically weak and aged and still possess a sound mind. Page on Wills, Vol. 1, (Bowe-Parker Revision) § 12.27.

Six of the contestants, two farmer neighbors of the testator—a father and son, and a woman who helped in his care at the Burgdorf home testified for the contestants on the issue of testamentary capacity. These contestants had visited the testator numerous times when he was in the hospital and the nursing homes. Their testimony was to the effect that he was not able to recognize them, or to speak intelligently, or to understand them when he spoke to him. They observed that his eyes were blank and watery. The two neighbors who also visited him often during this period said he was unable to communicate with them. The nurse observed that he was unable to communicate and seemed obsessed with sex. This latter trait was mentioned by the other woman testifying for the contestants. All of these witnesses were of the opinion that he did not possess the mental capacity to make a will.

However, a retired barber, who had been his longtime neighbor on the farm, testified as to conversations he had with the testator on numerous visits with him during his last illness. All of these seem to have been lucid and the testator had no difficulty recognizing him and introducing him to others who happened to be in the room. During one of these visits he made arrangements with the witness to have

his hair trimmed by him while in the hospital. The barber's son, who had known him for 50 years, gave similar testimony. He also stated that the testator had remarked that he didn't have enough property for all of his relatives, and told him he was going to leave it to the Ramls because they had looked after him. Both of these witnesses were of the opinion that during the time in question the decedent was mentally competent. The conversations they related having with him support this conclusion.

The attesting witnesses and the Ramls all testified that he was mentally competent to make a will. Another witness for the proponent was the vice president of the bank at Kranzburg, where testator did his business, and who had been acquainted with him for 40 years. He had visited with him at the hospital and the Burgdorf home during his last illness. He testified concerning several conversations which they had which appear to have been entirely normal. It was his opinion that the testator understood the nature and extent of his property and was capable of making a rational disposition of it. It was his view that he was of sound mind. He said that during that time the testator's mental condition was about the same as it was previous to his hospitalization.

The nurse's records for the period of his first hospitalization were stipulated into evidence. They are largely descriptive of his physical condition. While they refer to the patient as being somewhat confused shortly after he was hospitalized and that he was dizzy on one occasion, they also mentioned the fact that during the latter part of his stay he was alert and coherent. It is fair to infer that he had his worst days when suffering his mild stroke. After that he appears to have improved to the point of enjoying his visits during which he was cheerful and talkative. This continued to the time of his discharge.

Doctor Brevick saw the patient every day he was in the hospital. He responded well to treatment. He also saw him at the Burgdorf home and the second time he was in the hospital. During his first hospitalization he talked with the doctor about making a will. Apparently Mr. Green had inquired of the doctor if he was competent to make a will. This

caused the doctor to ask questions of him each day so as to be able to determine his competency. It was his opinion that the testator was of sound mind during this period and that when he was moved to the Burgdorf home he was competent.

On December 27th when he was moved from the home to the hospital the doctor again examined him. At that time he was suffering a chronic brain syndrome. In layman's language that is a condition that is close to senility. When pressed on cross-examination as to whether he was then mentally incompetent the doctor, testifying without his notes which apparently had been lost, said that he could not answer that yes or no. He did say, however, that "At least, he was no where as competent as he was when he was discharged on November 19." This examination was more than a month after the will had been executed.

On January 5, 1967, after the testator had been moved to the home in Clear Lake, Mrs. Raml petitioned to be and was appointed the guardian of his estate. Contestants make much of this fact. This was about six weeks after the execution of the will. While her petition states that he has become forgetful, uncertain and not well oriented, these statements must be viewed in the light of the other allegations in the petition that these symptoms are of recent origin having appeared in the last few weeks before the filing of the petition.

It was for the trial judge to select from the conflicting evidence that which he would believe. He, not this court, is the trier of the facts. Obviously he chose the proponent's version. From it he found that on the date of executing the will in question "the said John Hobelsberger was of sound and disposing mind and memory, competent and had testamentary capacity to execute a Last Will and Testament." Contestants challenge this finding. On review the successful party is entitled to the benefit of his version of the evidence, and of all favorable inferences fairly deducible therefrom. In re Blake's Estate, supra.

In this jurisdiction appellate review of findings of fact is now governed by SDCL 15-6-52(a). That section provides in part that:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

This quoted terminology came into our law as a part of Rule 52(a) of our 1966 Rules of Civil Procedure, which took it from Federal Rule 52(a). In adopting this portion of the Federal Rule is it presumed that we adopted it with the meaning previously given it by the United States Supreme Court. Melby v. Anderson, 64 S.D. 249, 266 N.W. 135. This was the view of the State Bar Committee which proposed these rules for adoption. See the paperback pamphlet of the rules printed and distributed by the West Publishing Company—Introduction, p. IV.

The United States Supreme Court in construing that language in United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746, and rehearing denied 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147, said:

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

See Barron & Holtzoff (Wright) Federal Practice and Procedure—Rules Edition, § 1133.

■ While we are not bound by this construction, we accept it as a guide in determining the meaning of the quoted language in our rule. State v. Henglefelt, 72 S.D. 306, 33 N.W.2d 492. In applying the clearly erroneous standard we must bear in mind that our function is not to decide factual issues de novo. The question for the appellate court is not whether it would have made the same findings the trial court did, but whether on the entire evidence it is left with a definite and firm conviction that a mistake has been committed. Zenith Radio Corporation v. Hazeltine Research Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129. A painstaking review of the record does not leave us with a definite and firm conviction that the trial court was mistaken in making the finding concerning testamentary capacity.

In support of their claim of undue influence the contestants urge that the disposition made by the will is unnatural. If it is subject to reasonable explanation even though apparently unnatural, it becomes understandable. Johnson v. Shaver, 41 S.D. 585, 172 N.W. 676; In re Brown's Estate, supra. Accepting the evidence of the proponent, the will merely prefers a grandniece and her husband who have been helpful to him during the years when he had need of such concern. In re Swanson's Estate, 54 S.D. 42, 222 N.W. 491. Such recognition is not necessarily improper.

What could be more natural in view of his feeling that he did not have enough to remember all of his heirs? Moreover, his nieces, nephews, grandnieces, and grandnephews because of such relationship alone, are not the natural objects of his bounty. In re Rowland's Estate, 70 S.D. 419, 18 N.W.2d 290. Our law does not require that a testator recognize his relatives equally or at all. In re Blake's Estate, supra. In any event it is only a circumstance to be considered with the other evidence bearing on the issue. In re Vetter's Estate, 75 S.D. 417, 66 N.W.2d 519.

■ Contestants seize on the fact that the Ramls had a motive and the opportunity to exert an undue influence on the testator. These factors alone are not sufficient to invalidate the will. To accomplish that result there must be evidence that they did exert such influence. Ekern v. Erickson, 37 S.D. 300, 157 N.W. 1062; Gillette v. McLaughlin, 44 S.D. 499, 184 N.W. 277; In re Swanson's Estate, supra. Here there is none. That the Ramls were provided for in the will and had an opportunity to influence him does not prove that they did. Gillette v. McLaughlin, supra; Tobin v. Nordness, 47 S.D. 255, 197 N.W. 783. Nor is it alone sufficient to warrant an inference of undue influence. Peterson v. Imbsen, 46 S.D. 540, 194 N.W. 842.

On this issue the contestants urge consideration of the fact that the Ramls did not tell the others about the will. In Johnson v. Shaver, this court said the keeping of a will secret from those who have an equal right to know is a badge of undue influence. This was subsequently modified by hold-

ing that it was not such a badge under all circumstances. In re Armstrong's Estate, 65 S.D. 233, 272 N.W. 799. Under the facts of that case it was held not to be. The circumstances here are a far cry from those in Johnson v. Shaver. We feel that no such duty existed in this case. And even if it did, it was but another factor to be weighed in determining the issue of undue influence.

■ They also urge that between the Ramls and the testator there existed a confidential relationship which has a bearing on this issue. Such relationship exists whenever trust and confidence is reposed by the testator in the integrity and fidelity of another. Hyde v. Hyde, 78 S.D. 176, 99 N.W.2d 788; Schwartzle v. Dale, 74 S.D. 467, 54 N.W.2d 361, 94 C.J.S. Wills § 230. Even if the relationship between them rose to that level, which appears doubtful, it would not require a finding of undue influence nor raise a presumption of such which the beneficiary has the burden of disproving. Its existence, however, may demand close judicial scrutiny and is another item for the court to ponder in deciding the issue. In re Rowland's Estate, supra.

■ No presumption of undue influence is raised from the fact that the benefits received under a will were obtained by acts of kindness of the beneficiary. 57 Am.Jur., Wills, § 388. Such presumption arises only where a confidential relationship exists between a testator and a beneficiary who actively participates in the preparation and execution of a will under which he unduly profits. In re Metz' Estate, 78 S.D. 212, 100 N.W.2d 393. But that is not this case.

Here the only thing the Ramls had to do with the preparation of the will was to tell the lawyer designated by the testator that he wanted to talk with him. Their testimony was that otherwise they had never talked to the testator about his property or his will. They first learned of its existence and contents when they happened in his room in the Burgdorf home when it was to be read to him. They were ready to leave the room but remained at the testator's request after the lawyer assured him that they could properly be there.

■ On this record the trial court found that at the time of executing the will John Hobelsberger was not acting under undue influence of any sort by any person or persons. We are not persuaded that this finding is clearly erroneous.

In subscribing the will testator did so with a mark. SD-CL 2-14-2(23) provides:

> " 'Signature or subscription' includes mark, when the person cannot write, his name being written near such mark, and written by a person who writes his own name as a witness;"

It appears that he was a person who was able to write and had signed checks before and after the execution of the will with the help of Mrs. Raml. It is fair to infer that at earlier times he had been able to do so without any help. Contestants argue that because of this he is not one authorized to sign with a mark. It is their only complaint as to the execution of the instrument. This we think is a too restricted view of our statute.

■ In re Guilfoyle's Will, 96 Cal. 598, 31 p. 553, the court wrote concerning a similar enactment:

> "Persons who know how to write may become physically incapable of writing their names by reason of rheumatism, or paralysis of the hands, and other causes besides general physical debility, though of sound mind; and it seems unreasonable that the legislature intended to exclude all such persons from the privilege of subscribing a will or other instrument by a mark. The language of the Code is, 'when the person cannot write.' This fairly includes all persons who are unable to write from any cause, even though they know how to write."

See also In re Crawford's Will, 46 S.C. 299, 24 S.E. 69. It appears that at the time of subscribing the will the testator said he could not write because he had trouble with his hands. That this was so becomes apparent on examination of the checks that he had attempted to sign, with the help of others, shortly before and after that occasion. It follows the trial

court did not err in holding that the will under attack had been validly executed.

Affirmed.

All the Judges concur.