UNION BANK & TRUST et al., Appellants, v.
CADWELL et al., Respondents

(189 N.W.2d 515)

(File No. 10923. Opinion filed September 2, 1971)

**Willy, Pruitt & Matthews, Roy E. Willy, Acie W. Matthews, Christopherson & Bailin, C. A. Christopherson,** Sioux Falls, for Union Bank & Trust.

**Davenport, Evans, Hurwitz & Smith, Ellsworth E. Evans,** Sioux Falls, for Crippled Children's Hospital and School, appellants.

**Doyle, Bierle & Hagerty, James E. Doyle,** Yankton, for respondents.

HANSON, Judge.

James M. Lloyd died leaving a will dated June 14, 1965, known as the "Durand Will" and another dated September 22, 1966, known as the "Bielski Will". Probate proceedings were commenced in the Yankton County Court to determine which was entitled to probate. The county court admitted the Bielski Will. This determination was reversed on appeal to circuit court which found the revocation of the Durand Will, the Bielski Will, and its codicil were all executed as the result of undue influence exercised by Richard M. Bielski on the mind of James M. Lloyd. The Durand Will was admitted to probate and Don B. Cadwell and Albert M. Nelson were named as executors. The Union Bank & Trust Company, as executor named in the codicil to the Bielski Will, and The Crippled Children's Hospital and School of Sioux Falls jointly appeal.

The record is voluminous. The transcript contains over 500 pages, and there are 126 exhibits including corporate records, guardianship proceedings, and a fraud action brought by the guardian of James M. Lloyd against Richard M. Bielski, Donald M. Thompson, and the Lobido Corporation. With reference to the contents of the record we find no merit in appellants' assigned errors relative to the admission of certain testimony and exhibits in evidence. The trial court did not abuse its discretion in any of the evidentiary rulings complained of.

Viewing the evidence in the light most favorable to the findings of the trial court, as we must do on review, it appears the decedent James M. Lloyd was a lifetime resident of the City of Yankton. He was a banker and acquired a sizeable estate. He never married and lived in the family home with his sister Clara until her death in February, 1965. Thereafter, Lloyd lived in the home alone until his death on March 19, 1969, at the age of 83. He was survived by two nieces, a nephew, and two grandnieces and a grandnephew.

On June 14, 1965, Lloyd executed a will prepared by Harrison Durand, an attorney practicing in New York, who was an old friend of the family. This will bequeathed the "clothing, jewelry and personal effects, furniture, furnishings, household effects, automobiles and other tangible personal property (except cash) * * * as my brother, William Lloyd, but if he shall predecease me, as his wife, Carol C. Lloyd, shall select * * * any such property not so selected to be disposed of as a part of my residuary estate." Such will further provided the following specific bequests:

| | |
|---|---:|
| To the Oriental Consistory No. 1, Yankton, South Dakota | $10,000.00 |
| To St. John's Lodge No. 1, Yankton, S. D. | 5,000.00 |
| To Benevolent and Protective Order of Elks Lodge No. 994, Yankton, S. Dak. | 5,000.00 |
| To the South Dakota Children's Home Society of Sioux Falls, South Dakota | 10,000.00 |
| To the decedent's brother, William Lloyd or to his surviving wife, Carol C. Lloyd | 100,000.00 |
| To Lloyd's niece, Marian Wehinger | 50,000.00 |
| To Lloyd's nephew, David Lloyd | 5,000.00 |
| To Lloyd's niece, Sydney Cornwall | 5,000.00 |
| To Lloyd's grandniece, Jane Wehinger | 5,000.00 |
| To Lloyd's grandniece, Annita Wehinger | 5,000.00 |
| To Lloyd's grandnephew, James Wehinger | 5,000.00 |

It then provided that all of the rest, residue and remainder of the estate was to go to Yankton College of Yankton, South Dakota.

Lloyd was active in the business, social, fraternal, and political affairs of his community. He served as State Senator from Yankton County from 1959 through 1964. While serving in the legislature Lloyd became acquainted with Richard M. Bielski, a member of the House of Representatives from Minnehaha County. Lloyd liked to entertain and to be entertained. He also took considerable pride in his position of prestige as a banker, state senator, and community leader. His position and way of life, however, was considerably changed following the death of his sister in February 1965, and the sale of his interest in the American State Bank.

About this time Richard M. Bielski took an active interest in Mr. Lloyd and his financial affairs. Bielski was an attorney in Sioux Falls who had recently been actively interested in an unsuccessful development known as the Valley Hi Country Club in Rapid City. Bielski first came to Yankton and conferred with Lloyd on February 12, 1965, about Lloyd's tax liability on the sale of the bank stock. A few months later Bielski established a law office in Yankton. His family never moved from Sioux Falls.

After Bielski established a law practice in Yankton he devoted most of his time and attention to Lloyd. He became Lloyd's attorney and the relationship of attorney and client continued until Lloyd's death. The two were together almost constantly and the legal-social relationship became very close. This culminated in Bielski's management of Lloyd's affairs. During the spring of 1966 Bielski made a complete inventory of all of Lloyd's property.

Early in 1966 Bielski was actively interested in assisting his friend, Donald M. Thompson, who was serving time in the California State Penitentiary for armed robbery of supermarkets. Bielski convinced Lloyd that Thompson was unjustly accused and was an experienced expert in the grocery business. In this respect the trial court significantly observed in his Memorandum Opinion that Bielski "sold

Lloyd on Thompson's ability and greatness and the idea of forming a chain of grocery stores. Lloyd was a proud man and doubtless was smarting because of his loss of prestige in the community due to his severance of relations in the American State Bank and his growing senility. Bielski evidently recognized this state of mind and in May 21, 1966, wrote a letter to Mr. Lloyd, Ex. 14, which outlined his suggestion for Lloyd to recoup and retain his prestige for years after his death. The suggestions fell on fertile ground and from then on until his death, "he was a puppet in the hands of Bielski."

Thompson was released from the California State Penitentiary in April 1966. He came to Yankton and the Lobido Corporation was formed. The corporate name was coined from the letters LO for Lloyd BI for Bielski, and DO for Don (Thompson). The corporation was funded by Lloyd in the amount of $50,000 and the stock was divided equally among the three incorporators. Bielski and Thompson gave Lloyd their promissory notes for their shares of stock. Thompson also assigned the story of his life to the corporation so long as he "remained in charge of retail operations" of the company. Soon after the corporation was formed it purchased a grocery store in Red Wing, Minnesota. Thompson took charge as manager.

During the next two years the Lobido Corporation expanded rapidly. It purchased two supermarkets in Rochester, Minnesota; three Foodland Stores in Sioux Falls; and plans were drawn up to construct a giant supermarket in Rochester to be known as The International Plaza which was to occupy 40,000 square feet. The corporate funding in the amount of hundreds of thousands of dollars was all furnished or guaranteed by Lloyd. For example, in November, 1966 Lloyd turned over $350,000 to the corporation. In return he received a Guaranteed Debenture. A back-dated promissory note was then substituted for the Debenture. Later Bielski prepared and obtained Lloyd's signature to a Subordination Agreement whereby Lloyd subordinated the repayment of the $350,000 promissory note to any other loan made or to be made by Lobido Corporation. About the same time a

Guarantee was executed by Bielski, Lloyd and Thompson in favor of the Olmsted County Bank and Trust Company of Rochester, Minnesota in consideration of credit to be given by the bank to the Lobido Corporation in an amount not to exceed $350,000. According to Bielski, Lloyd said his entire estate was available to the corporation.

Substantial Lobido Corporation money was funneled into the hands of Bielski and Thompson in various ways. Both received salaries of approximately $40,000 per year. Each received thousands of dollars for expenses of travel, entertainment, etc. Each had Cadillacs purchased by the corporation. Each had the use of luxury cabin cruisers purchased with corporate funds in excess of $27,000. Each was insured for $75,000 with premiums paid by the corporation to Bielski's brother. The same brother also sold the corporation a $100,000 mutual funds investment program which was payable on a monthly basis. In addition, Bielski sold his law office equipment to the corporation and also received over $12,000 for legal services rendered. Understandably, the Lobido Corporation sustained a total loss of over $250,000 during its operation by Bielski and Thompson.

In August 1966 Bielski reviewed the Durand Will for Lloyd. Afterwards he rendered an opinion to the effect that under the "tangible property" provision Lloyd's sister-in-law would be entitled to the entire estate, except for the cash on hand and the real property. Consequently, there would be no funds to pay the specific bequests and there would be no residuary estate for the use and benefit of Yankton College.

Bielski's opinion induced Lloyd to execute a Revocation of the Durand Will on September 1, 1966. Between the 1st and 22nd of September, 1966, Bielski and Lloyd were constantly together day and night. Their conversation was mainly oriented, according to the testimony of Bielski, toward the preparation of the "Bielski Will" which was executed by Lloyd on September 22, 1966. This Will named Fred Leach as Trustee and Executor and provided only $4,000 in cash bequests. The balance of the estate was divided into a family trust in the amount of $150,000 and the residue

in a charitable trust. The family trust was to exist 25 years and every five years one-fifth of the corpus was to be divided equally among Carol Lloyd and two nieces and a nephew. The charitable trust was to exist 25 years before any corpus was to be withdrawn with the net income to go 75% to Yankton College and 25% to the Crippled Children's Hospital and School. At the end of 25 years, the corpus was to be distributed on the same percentage **except** the Trustee, in his **sole** opinion, **may temporarily** or **permanently** terminate any **income** or **corpus** of the trust and select **other** charitable beneficiaries. Other provisions common to both trusts granted the trustee the power to **create** and **forgive** indebtedness **without prior beneficiary or court approval** and **without personal liability** for errors in judgment on the part of the Trustee. Further, **in making investments, the Trustee was instructed to assist in every way possible the expansion of** Lobido Corporation. The Bielski Will stated, "that in so doing it may in some way compensate my friend, Donald M. Thompson, for the great suffering he has undergone." Further, "Because of my friendship and association with Richard M. Bielski, together with his close knowledge of my affairs and desires, I would request that my trustee utilize his assistance and advice on all matters in administering this trust if he so desires." Further, the Will provided that should any named beneficiary contest the Will or trusts then that beneficiary shall receive nothing. Fred Leach was given **sole** authority to select his successor to likewise act without bond.

On April 7, 1967, a Codicil to the Bielski Will was executed which changed the Executor and Trustee from Fred Leach to the Union Bank and Trust Company of Sioux Falls. It further provided, "Because of my keen interest in the growth and expansion of this said company (Lobido Corporation) plus my deep feeling for my associates therein (Bielski and Thompson) and their efforts in connection therewith, I hereby direct and instruct my Executor and Trustee, as newly appointed, whichever the case may be, to **forgive and cancel** any money which may still be due me from said company on the date of my death, such remaining obligation, if any, to be a **tax-free gift,** with my sincere wish for growth and success.

My connection with this particular business enterprise and my associates has been one of the greater joys in my life, particularly any help which I might have rendered to my friend and associate Donald M. Thompson, who I feel was so unjustly wronged by society. " The Codicil provided that should any named beneficiary contest the Will, Cocidil and trusts, then that beneficiary shall receive nothing.

The execution of the Revocation of the Durand Will, the Bielski Will, and the Codicil all followed the same pattern. After the instruments were prepared Bielski would take Lloyd to Elk Point where they were witnessed by officials of the Elk Point Bank. The day after the Revocation of the Durand Will was executed Bielski wrote the banker at Elk Point a letter detailing the conversation which took place at the bank when the Revocation was signed. Its concluding paragraph states:

> "I have been involved in various Will contests during my law practice so I know what type of questions might develop at a later date in connection with this matter. For that reason I would suggest that you each (Hanson and Olson) keep a copy of this letter in your files for future reference, should the need ever arise."

Bielski wrote a similar letter to the same banker on August 1, 1967, regarding conversations at the bank when the Will and the Codicil were signed. One of the concluding paragraphs stated "I think it wise, O. D., that these things be put down in black and white and filed away for future reference if ever need be. Hence the reason for this letter."

After the Codicil to the Will was executed the following notation appears on the Lobido Corporation minute book:

> "Mr. Lloyd then explained that being associated with us in the Lobido corporation was one of his happiest possible experiences because it filled such a big void in his life now that he was out of the bank and virtually everyone had left him; that he wanted us to have as many stores possible before

he died so that Hap Rhian and other Yankton busy-bodies could ultimately find out that he still knew how to invest his money; that he wanted to invest much more if the company ever needed it. He also explained that the reason he was cancelling any money which the company might owe him upon his death, tax free, was because Don Thompson had assigned the story of his life to the company when the corporation was formed, which could result in a fortune to the company, and he wanted our company to grow into a successful chain with as few financial problems as possible;" etc.

There was approximately a quarter of a million dollars due Lloyd on the sale of his bank stock and in the fall of 1967 Bielski was actively attempting to arrange a compromise settlement so the money could also be invested in the Lobido Corporation.

There is considerable evidence that Lloyd became senile and his mind progressively deteriorated from January 1965 until his death. He was confused, forgetful, and not oriented as to time and place. In 1966 and 1967 he was unable to recognize old associates and his retention periods were very short. He did not have sufficient intelligence and understanding to care for his everyday affairs. Letters, uncashed checks and other important documents and business papers piled up in his home. His dress became shabby and dirty. His license to drive an automobile was revoked following an accident in the spring of 1967. He became slow in gait, speech, and memory.

In November 1967 Jerald B. Davis was appointed guardian of Lloyd's estate. Legal proceedings were then commenced against Bielski, Thompson, and the Lobido Corporation culminating in the appointment of a receiver for the corporation and its eventual dissolution.

The evidence clearly shows the influence exerted by Richard M. Bielski upon James M. Lloyd was sufficient to substitute the wishes and will of Bielski for those of Lloyd. The trial court found that although Lloyd was senile

and his mind was gradually failing from January 1965 he nevertheless had capacity on the dates of the Bielski Revocation, Will, and Codicil to be a proper subject of undue influence. In addition the court found: there was an opportunity to exert undue influence and effect a wrongful purpose because of the close and confidential legal and social relationship between Bielski and Lloyd; there was a disposition to do so by the formation of the Lobido Corporation as a conduit through which Lloyd's entire estate could be funneled into the hands of Bielski and Thompson; and a result clearly showing the effect of such influence. See In Re Metz' Estate, 78 S.D. 212, 100 N.W.2d 393. Such findings were amply sustained by the evidence. Certainly, none of them is clearly erroneous within the rule of In Re Estate of Hobelsberger, 85 S.D. 282, 181 N.W.2d 455. The court, therefore, correctly concluded all of the Bielski documents were executed as the result of undue influence exerted by Richard M. Bielski upon the mind of James M. Lloyd and the Bielski Will and Codicil should be refused probate in their entirety.

■ The court went on and adopted the following findings of fact proposed by the appellant Crippled Children's Hospital and School:

"A. That between June 14, 1965, the date of the execution of the first Will, and September 22, 1966, the date of the execution of the second Will, James M. Lloyd had become a Director of Crippled Children's Hospital and School, had indicated a great interest in this institution and the charitable work being rendered by such institution, and indicated that he would remember such institution in his Last Will and Testament.

B. That there is no evidence whatsoever of any undue influence that affected the specific bequest to said Crippled Children's Hospital and School that said bequest is separate, complete and intelligible in and of itself."

In view of such findings the Crippled Children's Hospital and School contends the court should have entered judgment

ordering payment of its specific bequest. As authority SDCL 29-2-5 is cited:

"A will or part of a will procured to be made by duress, menace, fraud, or undue influence, may be denied probate; and a revocation procured by the same means may be declared void."

According to Page on Wills statutes of this nature merely restate the common law rule and mean:

"If a part of the will is caused by undue influence, and such undue influence does not affect the remaining provisions of the will, the validity of the provisions which are not caused by such undue influence depends, in part, on whether it is possible to ascertain which portions are caused by the undue influence, and whether such portions, if ascertained, can be held to be invalid without destroying the intention of the testator. If it is not practicable to ascertain what portions of the will were caused by undue influence and what were free from it, or if effect cannot be given to such provisions as are not caused by undue influence, without defeating the intention of the testator, the entire will is invalid." Vol. 1, Page on Wills, § 15.12, p. 741.

Similarly, according to 57 Am.Jur., Wills, § 366, p. 266,

"the general rule is that parts of a will may be held valid notwithstanding other parts are invalid on account of undue influence exercised upon the testator, provided the parts so affected are separable so that the will remains intelligible in itself if the invalid parts are deleted upon probate. In other words, the valid portions of the will may stand and be admitted to probate, although other parts are denied probate, or are set aside, as obtained through undue influence, unless the provisions are so interdependent that the valid cannot be separated from the invalid without defeating the general intent of the testator. It is said that a failure of justice results if, by arbitrary rule, an entire will must be

declared invalid on the ground of undue influence, where only a separable portion is affected by such influence."

The general rule as stated above is subject to the limitation that it is not applicable when it will defeat the manifest intent of the testator, interfere with the general scheme of distribution, or work an injustice to other heirs. The doctrine is not applicable where it is impossible to determine to what extent specific legacies have been tainted by the undue influence; in such a situation the whole will must either be refused probate or admitted thereto. Moreover, the rule which permits the probate of part of a will notwithstanding other parts are declared invalid as affected by undue influence does not mean that a legatee may sustain his bequest on the ground that he did not participate in bringing undue influence to bear on the testator, where it appears that the entire instrument was the result of undue influence."

The Crippled Children's Hospital and School was not given a specific bequest of a certain amount of money in the Bielski Will. It was one of the percentage beneficiaries of the charitable trust. In view of the extraordinary trust provisions the amount of such benefit is unknown, uncertain and directly dependent upon the whim of the trustee. Furthermore, to uphold this partial trust provision as "separate, complete and intelligible in and of itself" would do violence to the entire testamentary scheme of distribution provided in the Durand Will which merely contained specific bequests of money together with a single residuary legatee. Under the circumstances, the trial court correctly concluded the Bielski Will and Codicil were tainted by undue influence and "in their entirety should be refused probate."

Affirmed.

All the Judges concur.

BIEGELMEIER, Judge (concurring).

I concur fully in the opinion and add the evidence shows a studied and carefully contrived plan to take over control

of and spend the life earnings of a frugal man by a lawyer who had wormed his way into the confidence of testator in his last failing years of life. It brings to mind the saying that the voice may appear to be that of Jacob (Lloyd) but the hands that drew the will were those of Esau (Bielski). Genesis, Ch. XXVII, v. 22.