**Arlin HEINRICH, Plaintiff and Appellee,**

**v.**

**R.L. OIL & GAS CO., INC., a South Dakota Corporation, and Ronald Lavielle and Carol Lavielle, Individually, Defendants and Appellants.**

**No. 16266.**

Supreme Court of South Dakota.

Considered on Briefs March 21, 1989.

Decided June 21, 1989.

Rehearing Denied July 24, 1989.

Curtis D. Ireland, Rapid City, for plaintiff and appellee.

Mark F. Marshall of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for defendants and appellants.

HENDERSON, Justice.

PROCEDURAL HISTORY/ISSUES

We hold that a broker is entitled to a real estate commission when he produces a ready, willing and able buyer to purchase seller's property under a real estate listing agreement.

Ron and Carol Lavielle (Sellers/Appellants)[1] are sole stockholders and officers of R.L. Oil & Gas Co., Inc., a corporation, which is also a named defendant in this suit. Arlin Heinrich (Broker/Appellee)[2], is

---

1. Ron Lavielle had experience in the bulk fuel and gas business for thirteen years. He was knowledgeable about securing loans and had an SBA loan on his business.

2. Heinrich is an independent real estate broker with experience in SBA loan procedures. Before going into the real estate business, he was a

an independent real estate broker. Lavielles engaged Heinrich to sell their bulk fuel business and two convenience stores. Curt Larive (Buyer) became interested in Sellers' property. A sale agreement between Buyer and Sellers collapsed, resulting in this lawsuit. Broker seeks to recover his lost sales commission. Broker prevailed at a nonjury trial in the circuit court for Fall River County. He was awarded $47,461.50 in damages (seven percent of the sales price) plus taxable costs. Sellers maintain that the trial court erred in two regards:

1) Buyer was not an "able purchaser" because he was dependent on third parties who were not bound to provide funds; and

2) Broker was not entitled to commission because Buyer could not purchase an Amoco "jobbership" and was, in any case, not an "able purchaser."

We affirm.

### FACTS

On February 26, 1985, Sellers and Broker entered into a one-year listing agreement[3] concerning sale of their property, the R.L. Oil & Gas Company, and two convenience stores, the Amoco Food Mart and Pop In Mart. The major asset of the Company was a jobbership contract with the Amoco Oil Company (Amoco), which provided two-thirds of Company's gross receipts. During the term of the listing agreement, Buyer contacted Broker about selling some of his own property, an Amoco station. Broker informed Buyer of Sellers' interest in selling Company and the convenience stores.

Buyer made his first offer to Sellers on September 24, 1985. The total sales price was to be $780,000, part of which was to be a mobile home park owned by Buyer. Sellers were not interested in taking Buyer's property in trade, and refused this offer. Buyer made a second offer, of $780,000, with no reference to any trade-in property, on October 29, 1985. Sellers made a counteroffer, which boosted the sales price to $850,000, and added a provision giving Buyer a right of first refusal if another acceptable offer came in prior to closing. Buyer accepted the counteroffer, and initialed the changes, which were typed on an "Offer and Agreement to Purchase" form which had been prepared with the terms of his second offer.[4] Although the form, signed by Sellers and Buyer, specified that the offer was contingent upon Buyer obtaining a Small Business Administration (SBA) mortgage, "in that amount," said agency could by law guarantee only $500,000 of any loan.

SBA could guarantee loans with no cash down payment, and decided each case individually. A prerequisite to SBA consideration, however, was provision of either detailed financial statements, prepared by an accountant, of the business to be purchased or tax returns, covering, in either case, the previous three years.

Sellers did not make the necessary financial records available to Buyer. Buyer went to Sellers' bank, which had Sellers' financial records on file, to seek these records, but was informed that he needed

Standard Oil retailer for approximately eight years.

3. This agreement provided, in part:

   If during said period, the property is sold by the Agent, by me or anyone else; *or if the Agent produces a purchaser ready, willing and able to purchase the property;* or within sixty days after the expiration of said period a sale is made to any person who the property has been shown by me or referred by the Agent, I agree to pay the Agent a commission of 7% of the selling price. (Emphasis supplied.)

4. The contract contained, *inter alia,* the following three provisions:

3. Other provisions[:] This offer is contingent upon the buyer obtaining a mortgage from SBA in that amount.

4. If this offer is contingent upon the buyer obtaining a new loan (FHA, VA or Other) the buyer agrees to immediately make application for and diligently endeavor to procure such loan without delay, and to sign and note and mortgage within (5) five days after they are ready.

   \*    \*    \*    \*    \*    \*

9. If this offer ... is contingent upon buyer obtaining FHA, VA or other loan, then this agreement (in either case) shall be abrogated and of no force or effect and buyer's earnest money shall be returned to him in full.

Sellers' approval to release them. Broker made numerous telephone calls to Sellers' business and home in November, and a trip to Hot Springs, in attempts to get the necessary financial records, to no avail. Sellers, according to Broker's testimony, told him each time that the records were not available yet. Ron Lavielle's testimony on the point was murky; he claimed at one point to have no memory of Buyer having made an offer, yet related that he told Broker to get the financial records from his accountant, although he had them at his home. Finally, Lavielle stated that he declined to furnish his own copies because Norm Wilson, of Amoco, informed Lavielle that he would not recommend that Amoco accept Buyer as a jobber. Interestingly, Wilson testified that it was not his decision to make, and that he gave his opinion to Ron Lavielle in an "off-the-cuff" manner.

The only financial data the Sellers actually made available was a "projection" of 1984 profits, prepared by Ron Lavielle without reference to his tax records, showing a net profit before tax of $242,037.53. This projection, if backed by adequate records, might have formed a basis for a bank loan to Buyer, backed to the legal limit by SBA, as such a high cash flow would reflect an ability to service the debt Buyer would acquire in purchasing the business. Sellers' actual net profit, however, based on 1984 tax returns, was $1,727.00. Sellers were actually operating at a loss.

Broker gave up his attempts to get Sellers' financial records in December 1985, when it became clear that no sale could be concluded by the closing date. Broker filed this action to recover the commission he would have made had the sale gone through, taking the position that Sellers' bad faith refusal to assist Buyer in acquiring a loan, by failing to make their records available, made it impossible for Buyer to consummate the contract. Sellers' position is that Buyer could not have qualified for the necessary financing, so Broker was entitled to no commission because he failed to produce an "able" purchaser.

## DECISION

Sellers' arguments essentially crystallize into this: Buyer was unable to amass sufficient funds to make the purchase and Broker, therefore, was entitled to no commission. Broker, on the other hand, maintains that Sellers wrongfully refused to furnish Buyer with financial records he needed to acquire financing.

■ The first segment of Sellers' brief, containing the assertion that Buyer's ability to purchase is a matter of law, is simply wrong. The case cited for this proposition, *Bublitz v. State Bank of Alcester*, 369 N.W.2d 137 (S.D.1985), concerned the effective date of a contract, and contains no reference to the issues at hand. Other authority indicates that determining if a buyer is "able", is a question of fact. *Otero v. Buslee*, 695 F.2d 1244, 1250 (10th Cir.1982) (applying New Mexico law). Thorough findings of fact and conclusions of law were entered by the trial court in a filed, formal decision. Our standard of review regarding factual issues is the "clearly erroneous" standard. *In re Estate of Hobelsberger*, 85 S.D. 282, 289, 181 N.W.2d 455, 459 (1970). The question for the appellate court is whether, on the entire evidence, it is left with a definite and firm conviction that a mistake has been committed. *Id.* We find no mistake.

Sellers' next argument in their brief, that a purchaser "who is dependent upon uncommitted third parties for financing is not, as a matter of law, an able purchaser" is misleading. We believe the quote, from *Peter M. Chalik & Associates v. Hermes*, 56 Wis.2d 151, 201 N.W.2d 514 (1972), is taken out of context. *Chalik* dealt with a buyer who was relying on his mother's unenforceable promise to lend him the money he needed, a factual pattern wholly irrelevant to this case. The "uncommitted third party" was the buyer's mother. *Chalik* does, however, define a financially able buyer:

> Generally speaking, a purchaser is financially ready and able to buy: (1) If he has the needed cash in hand, or (2) if he is personally possessed of assets—which in

part may consist of the property to be purchased—and a credit rating which enable him with reasonable certainty, to command the requisite funds at the required time, or (3) if he has definitely arranged to raise the necessary money— or as much thereof as he is unable to supply personally—by obtaining a binding commitment for a loan to him for that purpose by a financially able third party, irrespective of whether such loan be secured in part by the property to be purchased....

*Chalik*, 201 N.W.2d at 520. The same language appears in *ERA Town & Country Realty, Inc. v. Tevac, Inc.*, 376 N.W.2d 526, 529 (Minn.App.1985), and *Shell Oil Co. v. Kapler*, 235 Minn. 292, 50 N.W.2d 707, 712 (1951).

■ The Buyer, in this case, testified that he had a net worth of approximately $300,000 at the time in question.[5] Buyer would have to borrow to raise the major share of the $850,000 purchase price. Sellers, through refusal to make financial data available which was essential to such borrowing from banks, and essential to SBA consideration, made it impossible for him to even attempt to finance his purchase. Although Buyer's ability to finance had some hurdles to overcome, on this record we do not deem the trial court's finding of fact, that Buyer was financially able, to be clearly erroneous. There are always some wrinkles to iron out in financing large sums of money.[6] If the Sellers own estimate of annual cash flow ($240,000) was correct, Buyer might have received bank financing for $850,000 without cash down. This we glean from trial testimony of a bank vice-president, William Meyer. On the basis of the information supplied to Buyer and Broker by Sellers at the time, incomplete as this was, it was a reasonable and factual determination that Buyer was financially able. Buyer's failure to get financing was

directly caused by Sellers' refusal to furnish data.

■ The contracts which Sellers and Buyer signed, required Buyer to get an SBA mortgage for "this amount." If "this amount" means the full purchase price of $850,000, and Sellers insist on an SBA mortgage for that amount, the contract was impossible for this or any other buyer to fulfill. SBA had a ceiling of $500,000 on loans it would guarantee (not $450,000 as Sellers maintain). As no buyer could possibly qualify for an $850,000 SBA loan, Sellers argue that Buyer failed to meet a condition of the contract. We reject this argument. Restatement (Second) of Contracts § 270 comment b (1979), provides, in pertinent part:

> Where only part of an obligor's performance is impracticable, his duty to render the remaining part is unaffected if
>
> (a) it is still practicable for him to render performance that is substantial, taking account of any reasonable substitute performance that he is under a duty to render....

Section 270, comment b, indicates that if an obligor (Buyer) can render a reasonable substitute performance in place of the impracticable part, he must do so under his duty of good faith in performance. If Buyer could have arranged alternative financing, for example, $500,000 in an SBA guaranteed loan and the balance in cash, Sellers would not be complaining. A reasonable interpretation of the contract would be that Buyer was to get SBA backing of whatever amount is mortgaged. Both Sellers and Buyer had previous dealings with SBA. No testimony indicates that Sellers' decision to refuse access to their records was based on the SBA mortgage provision in the contract. We view this as extremely important in our consideration.

Sellers' last argument, that they are not liable because a local Amoco supervisor,

---

**5.** The trial court found per Finding of Fact XI that buyer had a net worth when he made his offer to purchase of Two Hundred Eighty Thousand Dollars ($280,000). Further, that he had the ability to either pledge or sell some of these assets for a down payment.

**6.** Per Finding of Fact XI, buyer had the ability to apply for an SBA loan, which might have been approved by the SBA, providing the business had a cash flow of over Two Hundred Forty Thousand Dollars ($240,000) as represented by the Sellers.

Norm Wilson, would not recommend that Amoco approve sale of the jobbership to Buyer, is rejected. The decision was not Wilson's to make, and, by his own testimony, his opinion was an "off-the-cuff" remark made without reference to any financial records. If this was Sellers' actual reason for refusing to assist Buyer, why did they not, at some point, tell either Broker or Buyer? The record reflects that Seller, Ron Lavielle, stalled Broker with a story that he was waiting for his tax returns from his accountant. Buyer went to the accountant; however, the accountant had no authorization from Sellers to release any information. This is corroborated by the accountant's own testimony. Ron Lavielle, in any event, conceded that he had copies in his possession the entire time. This was nothing less than bad faith. If bank or SBA financing and approval from Amoco were essential, and Sellers knew this, it was their duty to do what they could to aid in cooperating. Where an obligor's (Buyer's) duty cannot be performed without some act by the obligee (Sellers), courts supply "a contract term making that act a condition of the obligor's duty." Restatement (Second) of Contracts § 226 comment c (1979). The failures of Buyer to secure financing and Amoco's approval (Sellers did not make any effort to go beyond the informal conversation with Wilson, which was not binding), can thus be viewed as arising from Sellers' bad faith.

Restatement (Second) of Contracts § 205 (1979), imposes a duty of good faith and fair dealing in contracts, generally, and comment d to that section, concerning good faith performance, is persuasive here:

> d. *Good faith performance. Subterfuges and evasions violate the obligation of good faith in peformance even though the actor believes his conduct to be justified.* But the obligation goes further: *bad faith may be overt or may consist of inaction,* and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance. (Emphasis added.)

Sellers exhibited the types of bad faith catalogued above. It appears that they were bent on sabotaging the very listing agreement to which they were parties.

We reject Sellers' blandishments regarding Buyer's financial inability to perform:

> [I]t has been repeatedly held that, where a vendor has accepted a purchaser by entering into a contract for sale with him, he cannot thereafter question the purchaser's capacity to complete the transaction except in cases involving bad faith or fraud.

*Bailie v. Ridker,* 249 Minn. 161, 81 N.W.2d 798, 806 (1957). The Supreme Court of Alabama more recently followed this path:

> Acceptance by the seller is conclusive evidence of the fact that the purchaser was ready, able, and willing, thereby dispensing with the necessity of a factual determination on the issue.

*McLeod v. Wilson,* 445 So.2d 280, 282 (Ala. 1984). See, also, *Handley v. Schaffer,* 177 Ala. 636, 653, 59 So. 286, 291 (1912). Inability on the part of the Buyer is not available "as an afterthought" when the sale fails through the fault of the owner, who made no objection to the purchaser. *Blundt v. Wentland,* 250 Iowa 607, 93 N.W.2d 735, 740 (1958).

Affirmed.

All the Justices concur.