**Chris D. KARRAS, Plaintiff
and Appellee,**

v.

**Stephan A. GANNON, Defendant
and Appellant.**

Nos. 14075, 14078.

Supreme Court of South Dakota.

Considered on Briefs Oct. 28, 1983.

Decided Feb. 22, 1984.

Timothy J. Nimick of Woods, Fuller, Shultz & Smith, P.C., Sioux Falls, for plaintiff and appellee.

Jeff Masten of Masten, Myrabo & Irons, P.C., Canton, for defendant and appellant.

WOLLMAN, Justice.

This is an appeal from a judgment holding appellant in contempt of court and from another judgment against him for damages resulting from his breach of a lease agreement and from his injury to the leased premises. Appellee has filed a notice of review with respect to the latter judgment. We affirm the judgment for damages and reverse the judgment of contempt.

In 1979 Chris Karras (appellee) leased certain farm land in Lincoln County to Stephen Gannon (appellant). After Gannon had failed to pay rent, Karras initiated a forcible entry and unlawful detainer action against him in October of 1981. Because Karras believed that there was a possibility that waste might be committed upon the leased premises and that the crops might not be properly harvested and accounted for, he applied for and the circuit court issued a temporary restraining order on October 15, 1981, requiring Gannon to give Karras twenty-four hours' notice prior to the beginning of harvest and allowing Karras or his agent to be present during the harvesting operations.

Although a trial on the matter was scheduled for October 23, 1981, no trial was held. On October 26, 1981, counsel for the parties signed a stipulation and agreement establishing the condition and duration of the lease arrangement and providing that upon noncompliance with the stipulation and agreement Karras could apply for judgment in accordance with the stipulation and agreement without giving further notice. One of the conditions in this agreement was that Gannon would notify Karras "within a reasonable time before each harvest is to commence."

At 1:00 p.m. on October 30, 1981, Gannon called Karras to inform him that he would begin harvesting in twenty minutes. Karras informed Gannon that twenty minutes was insufficient notice but that he or an employee could be present at the harvesting at 4:00 p.m. At 4:00 p.m. Karras and an employee went to the leased premises and found that Gannon was in the process of harvesting the crop. At approximately 5:30 p.m. substitute counsel for Karras and counsel for Gannon met with Judge Hurd at the latter's home. Gannon was in the field and could not be contacted to be present at the "hearing." Although there is no record of this hearing, Karras' subsequent affidavit stated that the court orally ordered "that twelve hours notice before harvesting was a reasonable notice and ordered counsel for Defendant to so notify the Defendant and to advise him to stop harvesting." Gannon's attorney informed Gannon of this verbal order the next morning.

On the evening of November 22, 1981, Gannon called Karras and informed him that he would begin harvesting at noon on the following day. It was raining and snowing the next day, however, and Gannon could not commence harvesting. Gannon proceeded to harvest on November 24 and November 25 without giving Karras further notice.

On December 18, 1981, a hearing was held on Karras' motion to hold Gannon in contempt of court for violating the court's temporary restraining order of October 15, 1981, and the court's verbal order of October 30, 1981, and to establish damages pursuant to the stipulation and agreement. The circuit court subsequently issued a judgment holding Gannon in contempt for violating the October 30, 1981, verbal order and ordered that Gannon be incarcerated in the Minnehaha County jail until he purged himself of contempt by paying Karras $150 as costs for bringing on the hearing for contempt.

Gannon contends that the circuit court erred in holding him in contempt for violation of the October 30, 1981, order. We agree.

Although neither party has made an issue of this, we note that there is some question whether the contempt proceedings against Gannon were civil or criminal in

nature. In the early days of statehood, this court distinguished the two types of contempt as follows:

If the contempt consists in the refusal of a party to do something which he is ordered to do for the benefit or advantage of the opposite party, the process is civil, and he stands committed till he complies with the order. The order in such a case is not in the nature of a punishment, but is coercive, to compel him to act in accordance with the order of the court. If, on the other hand, the contempt consists in the doing of a forbidden act, injurious to the opposite party, the process is criminal, and conviction is followed by fine or imprisonment, or both; and this is by way of punishment. In one case the private party is interested in the enforcement of the order, and, the moment he is satisfied, the imprisonment ceases. On the other hand, the state alone is interested in the enforcement of the penalty, it being a punishment which operates *in terrorem*, and by that means has a tendency to prevent a repetition of the offense in other similar cases.

*State v. Knight*, 3 S.D. 509, 514, 54 N.W. 412, 413 (1893). More recently, we recognized that the distinction between the two forms of contempt is not always clear:

Since the instant contempt was not committed in the presence of the court, it is constructive contempt subject to the procedures in SDCL 23A–38–2, unless it is civil in nature. The distinction between civil and criminal contempt is often confused. [3] Wright & Miller, Federal Practice and Procedure, § 704. Contempt is civil where the contemnor may obtain relief if he acts according to a condition in the contempt order. In contrast, criminal contempt is unconditional. For example, the defendant is jailed or fined for a specific period or amount and cannot effect relief from the order. In any event, the same conduct can be subject to either criminal or civil contempt. *Gompers v. Bucks Stove & R. Co.*, 221 U.S. 418, 31 S.Ct. 492, 499, 55 L.Ed. 797 (1911); *United States v. United Mine Workers of America*, 330 U.S. 258, 67 S.Ct. 677, 699, 91 L.Ed. 884 (1947).

Since both civil and criminal contempts result in punishment, the distinction exists in the character and purpose of the punishment. "If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." *Ibid.*, 31 S.Ct. at 498.

*State v. Bullis*, 315 N.W.2d 485, 487 (S.D. 1982). We then went on to consider the four factors enumerated by the United States Supreme Court in *Gompers v. Bucks Stove & R. Co.*, 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911), as guidelines for making the distinction, which, in essence, are similar to those that this court set forth in *State v. Knight, supra.*

In the case before us, the distinction is indeed blurred. As far as we can tell from the record, at the time of the December 18 hearing on the contempt citation Gannon had completed the 1981 crop harvest. As there was nothing that a contempt order could coerce him to comply with, the judgment of contempt was in the nature of a punitive sanction to vindicate the court's authority. On the other hand, the judgment of contempt directed that Gannon be jailed until he had purged himself of contempt by paying Karras $150 as reimbursement for the costs of bringing on the contempt hearing. To that extent, then, the judgment of contempt was conditional and hence civil in nature. Moreover, the contempt proceedings were titled as part of the main case and did not indicate that the proceeding was criminal in nature.

Inasmuch as Gannon has not contended that the contempt proceedings were criminal and that he was therefore entitled to a jury trial pursuant to SDCL 23A–38–2, we need not decide whether the proceedings were truly civil or criminal in nature. We raise the issue only as an illustration of the consequences of the unorthodox manner in which Karras secured and then attempted to enforce the court's oral order.

■ The four elements of contempt are: (1) the existence of an order, (2) knowledge of the order, (3) ability to comply with the order, and (4) willful or contumacious disobedience of the order. *Rosseau v. Gesinger*, 330 N.W.2d 522, 524 (S.D.1983).

Gannon acknowledged at the contempt hearing that he had knowledge of the trial court's verbal order of October 30, 1981, and he did not claim that he did not have the ability to comply with the order. Accordingly, the questions remaining are whether the verbal order constituted a valid basis for a contempt finding and whether Gannon willfully or contumaciously disobeyed the order.

■ In determining whether the verbal order was enforceable through the contempt power of the trial court, we must keep in mind the distinction between a void order and one which is merely erroneous, for disobedience of a void order is not punishable as contempt, whereas an order erroneously or improvidently entered must be complied with. *Fienup v. Rentto*, 74 S.D. 329, 52 N.W.2d 486 (1952).

■ Although Gannon argues that SDCL 21–8–2(5), which precludes the granting of an injunction to prevent the breach of a contract, deprived the trial court of jurisdiction to enter the order in question, we do not view the verbal order as constituting an injunction as such. Inasmuch as Gannon does not contend that the thirty minutes' notice he was given of the forthcoming hearing in Judge Hurd's living room deprived the trial court of jurisdiction to enter the verbal order, we conclude that the court was not without jurisdiction to enter the order, putting aside any questions we might have concerning the need for such precipitous judicial action in the face of so insubstantial the threatened harm.

■ SDCL 15–6–58 provides that "an order becomes complete and effective when reduced to writing, signed by the court or judge, attested by the clerk and filed in his office." Notwithstanding this provision, we recognize that a court can hold a person in contempt for disobedience of its oral orders in cases of direct contempt. *See Deskins v. Waldt*, 81 Wash.2d 1, 499 P.2d 206 (1972); *Robertson v. Commonwealth*, 181 Va. 520, 25 S.E.2d 352, 146 A.L.R. 966 (1943); *see generally*, 17 Am.Jur.2d *Contempt* § 47 (1964). We believe, however, that cases involving direct contempt are distinguishable from the constructive contempt in the case at hand.[1]

In reviewing a case involving an unrecorded oral order given during a hearing at which the alleged contemnor was absent, the Supreme Court of Pennsylvania in *Commonwealth ex rel. Magaziner v. Magaziner*, 434 Pa. 1, 253 A.2d 263 (1969), commented: " 'Decrees and orders of courts of record cannot be carried in the breast of the judge who makes them. If any regard is to be had to the regular and orderly conduct of judicial proceedings in such courts, all their orders, rules, and decrees must be recorded.' " 434 Pa. 1, 7–8, 253 A.2d 263, 267 (1969). (Quoting from *In re Garis*, 185 Pa. 497, 501, 39 A. 1110 (1898). *See also In re Tumpson*, 236 Pa.Super. 568, 345 A.2d 774 (1975).

The courts of Texas have held that an oral order does not comply with the requirements of clarity and specificity in cases of constructive contempt.

One who is committed to jail for civil contempt should be able to find somewhere in the record the written order, which meets the requirements of *Ex Parte Slavin* 412 S.W.2d 43 (Tex.1967). It is the written order which is entered on the minutes, which a court is directed

---

1. In *Fienup v. Rentto, supra*, 74 S.D. at 331–32, 52 N.W.2d at 488, we defined direct and constructive contempt as follows:

Direct contempts are usually defined as words spoken or acts committed in the presence of the court or during its intermissions which tend to subvert, embarrass or prevent the administration of justice and may be summarily punished by the presiding judge as he may deem just and necessary. Constructive contempts arise from matters not transpiring in court, but in reference to the failure to comply with the orders and decrees issued by the court in a civil action for the benefit of the opposing party.

to sign, Tex.R.Civ.P. 306a, and which evidences one's rights and duties. Oral orders are poor substitutes for the requirement of one final judgment.

*Ex parte Padron,* 565 S.W.2d 921, 924 (Tex.1978). *See also Ex parte Grothe,* 570 S.W.2d 183 (Tex.Civ.App.1978).

Turning to our own decisions, in *State v. Knight, supra,* the trial court notified the mortgagor by telegram as follows: "... 'Have signed order restraining sale under mortgage, Frank La Due to A.M. Knight. A.W. Campbell.'" 3 S.D. at 511, 54 N.W. at 412. Judge Campbell's signature, of course, did not appear on the telegram itself, which was exhibited to the agents of the mortgagee by the mortgagor shortly before the foreclosure sale, with the request that they refrain from proceeding with the sale. The agents disregarded the telegram and proceeded with the foreclosure sale. In affirming the finding of contempt, the court wrote:

> The record shows that such an order was made, and it is alleged that it was brought to the knowledge of the plaintiffs in error, restraining the sale under the mortgage of Frank La Due to A.M. Knight; yet in the face of this knowledge these plaintiffs in error did proceed to make the sale. But it is said the manner in which this was communicated to them did not import to them such a legal notice as they were bound to respect.... The plaintiffs in error admit the receipt of the telegram stating an order had been made restraining them from proceeding with the sale. This was received before the sale had taken place. They do not deny that they knew that A.W. Campbell was the judge of the circuit court of the county in which the sale was to take place. If any doubts existed as to the genuineness of the telegram, there could have been no serious consequences following a postponement of the sale until such time as this could have been ascertained, and it was their duty to have done so. Not

having done so, as reasonable men would have done, the consequence must follow. *State v. Knight, supra,* 3 S.D. at 517, 54 N.W. at 415. *See also Talbert v. Talbert,* 290 N.W.2d 862 (S.D.1980); *Freeman·v. City of Huron,* 8 S.D. 435, 66 N.W. 928 (1896); *Burkhardt v. Georgia School Twp.,* 9 S.D. 315, 69 N.W. 16 (1896).

On the other hand, where a statute provides for the personal service of a judgment requiring the performance of an act other than the payment of money or the delivery of real or personal property, the failure to personally serve a certified copy of the judgment has been held to preclude the entry of a judgment of contempt. *See Krueger v. Krueger,* 32 S.D. 470, 143 N.W. 368 (1913); *Larson v. Larson,* 9 S.D. 1, 67 N.W. 842 (1896); *Scott v. Scott,* 9 S.D. 125, 68 N.W. 194 (1896).[2]

We recognize, of course, that there may well be circumstances in which the practicalities and exigencies of the moment preclude the entry and service of a written order, such as in the *Knight* case, *supra,* or during the course of a trial or hearing. As the Virginia court said in *Robertson v. Commonwealth, supra:*

> For instance, to say that a court could not compel a recalcitrant witness to answer a proper question which had been propounded to him without first interrupting the proceedings and reducing its command to writing and entering the same on its order book, would not only seriously delay and embarrass the proceedings but would require the diversion of the court's attention to collateral matters. The same would be true of an improper argument of counsel.

181 Va. at 531, 25 S.E.2d at 356. Once the exigencies of the moment have passed, however, and it is possible to enter and serve an order, subsequent noncompliance with an oral order should rarely, if ever, constitute grounds for a contempt proceed-

---

**2.** We note that the provisions of the codes of civil procedure that formed the basis for these holdings (§ 5112, 1887 Comp.Laws and § 330, 1903 Rv.Code of Civil Proc.) were carried forward to the 1919 Code (§ 2633) and to the 1939

Code (§ 33.1906). The present version of those provisions (SDCL 15–6–70) makes no mention of the service of a certified copy of such a judgment.

ing. Had Gannon failed to comply with the October 30 oral order on October 31 or November 1, 1981, a Saturday and Sunday, or even on the morning of November 2, 1981, the first court day following the entry of the verbal order, we might well have affirmed the finding of contempt, assuming a properly supported finding of willful or contumacious disobedience. As it was, however, Karras, having successfully importuned the trial court into holding a living-room judicial proceeding late on a Friday afternoon, did nothing during the ensuing three weeks to ensure that the oral order was reduced to writing, signed by the trial court, attested and filed by the clerk, and served upon Gannon. Had Karras exerted during the post-October 30 period even a modicum of the zeal that he manifested on the afternoon of October 30, he would not have put the trial court into the position of being called upon to vindicate an order that in retrospect may have been improvidently issued. In any event, in view of the fact that any exigency that may have justified the issuance of an oral order on the afternoon of October 30, 1981, had ceased to exist long prior to November 22, 1981, we hold that the oral order could not serve as the basis for a finding of contempt.

■ Likewise, we conclude that the trial court erred in finding that Gannon had violated the terms of the October 30 order. To form the basis for a subsequent finding of contempt, an order must state the details of compliance in such clear, specific, and unambiguous terms that the person to whom it is directed will know exactly what duties or obligations are imposed upon him. *Ex Parte Slavin,* 412 S.W.2d 43 (Tex.1967), and authorities cited therein. When measured against this standard, the directive that Gannon notify Karras twelve hours before harvesting was sufficiently ambiguous as to render Gannon's telephone call to Karras on the evening of November 22, 1981, at least arguably sufficient compliance. The verbal order, according to Karras' affidavit, required Gannon to notify Karras twelve hours before harvesting. One could interpret this directive either as requiring twelve hours' notice before each

separate movement in the field or as merely requiring twelve hours' notice of Gannon's intention to renew harvesting operations, subject to such weather-caused interruptions as occurred on November 23, 1981. Although in the light of provisions of the October 15, 1981, temporary restraining order, the former interpretation might appear to be the more logical, we are not disposed to interpret the latent ambiguity in the October 30 order in favor of a finding of contempt.

■ Turning to the other issues presented, Gannon contends that the trial court's findings regarding his failure to deliver bales pursuant to the lease and his failure to leave the leased property in a reasonably clean condition are clearly erroneous. Karras contends through his notice of review that the trial court erred in failing to assess damages for the wrongful disposal of a stove and refrigerator and in assessing only $36 damages for destruction of grass by Gannon's pigs. Our review of the record leads us to conclude that the challenged findings are not clearly erroneous. SDCL 15–6–52(a); *In re Estate of Hobelsberger,* 85 S.D. 282, 181 N.W.2d 455 (1970).

The judgment of contempt is reversed; the judgment for damages is affirmed.

DUNN and MORGAN, JJ., concur.

HENDERSON, J., concurs in result.

FOSHEIM, C.J., deeming himself disqualified, did not participate.

HENDERSON, Justice (concurring in result).

Although I concur in the results of this case, I cannot agree with all of the language and tenets of law therein expressed.

Particularly, I cannot conceive of affirming this contempt proceeding under any circumstance as it appears to me that the court order was void ab initio. I view the oral order as being injunctive in nature. This order was entered without sufficient notice, without a court reporter, without the parties' presence, without any findings or conclusions, and without any formal en-

try of the trial court's decision. Supposedly, the trial court's decision was to be relayed, by word of mouth, to a litigant who was being enjoined from a continuation of harvesting. Violations of an oral order expressed in a judge's living room, invites the return of the star chamber. Employing oral orders, injunctive in nature, as a basis of contempt proceedings would lead to a scenario of "who said what to whom."

Though this contempt proceeding arose during the course of civil proceedings, that did not bask it with a civil air. I would denominate it as a punitive type of contempt and label it as a criminal contempt proceeding.